IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

NATIONWIDE MUTUAL FIRE                      :
INSURANCE CO., as subrogee of              :
ROBERT SHARKEY and LYNN                     :
SHARKEY,                                     :
                                             :
                    Plaintiff,              :        C. A. No. 1:07-CV-00153 JJF
                                             :
        v.                                   :
                                             :
SEARS, ROEBUCK AND CO., a                  :
Massachusetts corporation,                   :
                                             :
                    Defendant.              :

**DEFENDANT'S BRIEF IN SUPPORT OF MOTION TO DISMISS/**
**MOTION FOR PARTIAL SUMMARY JUDGEMENT**
**<u>AS TO COUNTS TWO AND THREE OF PLAINTIFF'S COMPLAINT</u>**

# TABLE OF CONTENTS

I.   To the extent matters outside the pleadings are submitted and considered, Defendant respectfully seeks partial summary judgment pursuant to Fed.R.Civ.P. 56 as an alternative to Defendant's Motion to Dismiss. .................................................. 1

II.  Standard of Review ..................................................................................... 2

    *A. Motion to Dismiss* ...................................................................................... 2

    *B. Motion for Partial Summary Judgment* ........................................................ 2

III. The substantive law of the State of Delaware applies to Defendant's Motion to Dismiss as well as Defendant's Motion for Partial Summary Judgment ................ 4

IV.  Under applicable Delaware law, the claims set forth in Counts Two and Three of Plaintiff's Complaint are precluded and thus must be dismissed ............................ 4

    *A. Counts Two and Three of Plaintiff's Complaint are governed by Delaware's enactment of the Uniform Commercial Code, 6 Del.C. §2-101 et seq.* ..................................................... 4

    *B. Count Two of Plaintiff's Complaint fails to state a claim upon which relief can be granted as Delaware law does not recognize a cause of action for strict liability for allegedly defective goods.* ............................................................................................. 5

    *C. Count Three of Plaintiff's Complaint is barred by the four-year statute of limitations set forth in Section 2-725 of Delaware's enactment of the Uniform Commercial Code.* ....... 6

V.   Conclusion........................................................................................................ 9

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Airco, Inc.*, 2004 Del.Super. LEXIS 210, *24-25 (Del Supr. Ct. 2004)..................... 6

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................................. 3

*Carson v. Springfield Coll.*, Del.Super., 2006 WL 2242732, at *1 (Aug. 4, 2006)........................ 2

*Charlton v. Paramus Bd. Of Educ.*, 25 F.3d 194, 197 (3d Cir. 1994) ............................................ 4

*Cline v. Prowler Industries of Maryland, Inc.*, 418 A.2d 968, 972 (Del. 1980)............................. 5

*Dalton v. Ford Motor Company*, 2002 Del.Super. Lexis 132, *22 (Del Super. Ct. 2002)............. 8

*Di Ienno v. Libbey Glass Div., Owens-Illinois, Inc.*, 668 F.Supp. 373, 376 (D.Del. 1987) ........... 6

*Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)........................ 4

*Hansen v. Umtech Industrieservice Und Spedition*, 1996 U.S. Dist. LEXIS 10949, *43 (D.Del.
        1996) ...................................................................................................................................... 6

*Horowitz v. Fed. Kemper Life Assur. Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) ........................... 4

*Johnson v. Hockessin Tractor, Inc.*, 420 A.2d 154, 157 (Del. 1980) ......................................... 5, 7

*Lecates v. Hertrich Pontiac Buick, Co.*, 515 A.2d 163, 175 (Del.Super. Ct. 1986) ...................... 7

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 10 (1986).................... 3

*McIntyre v. Division of Youth Rehabilitation Services*, 795 F.Supp. 668, 673 (D.Del. 1992) ....... 2

*Ontario Hydro v. Zallea Systems, Inc.*, 569 F.Supp.1261, 1271 (D.Del. 1983) ............................ 4

*Pennsylvania Coal Ass'n v. Babitt*, 63 F.3d 231, 236 (3d Cir. 1995)............................................ 3

*Price v. Chaffinch*, D. Del., No. 04-956-GMS, 2006 WL 1313178 *1 (May 12, 2006) ............... 3

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)........................................ 3

*Rose v. Bartle*, 871 F.2d 331, 339-43 (3d Cir. 1989).................................................................... 1

*Schiavello v. Delmarva Systems Corporation*, 61 F.Supp.2d 110, 113 (D.Del. 1999).................. 4

*Sellon v. General Motors Corp.*, 571 F.Supp. 1094 (D.Del. 1983) ............................................... 8

*Tawes v. Frankford Volunteer Fire Company*, 2005 U.S. Dist. LEXIS 786, *4-5 (D. Del. 2005) 1

**Statutes**

6 Del.C. §2-101 *et seq.*........................................................................................................................ 4

6 Del.C. §2-102.............................................................................................................................. 4

6 Del.C. §2-105(1) ......................................................................................................................... 4

6 Del.C. § 2-314(1) ........................................................................................................................ 7

6 Del.C. § 2-725....................................................................................................................... 7, 8, 9

FED. R.CIV.P. 12(b)......................................................................................................................... 1

FED. R.CIV.P. 56 ............................................................................................................................. 2

FED.R.CIV.P. 56(b).......................................................................................................................... 1

FED.R.CIV.P. 56(c).......................................................................................................................... 2

FED.R.CIV.P. 56(e).......................................................................................................................... 3

Section 402A of the Second Restatement of the Law of Torts....................................................... 5

## NATURE AND STAGE OF THE PROCEEDINGS

COMES NOW the Defendant, Sears, Roebuck and Company ("Sears"), by and through its undersigned counsel, and files this Brief in Support of Motion to Dismiss/Motion for Partial Summary Judgment as to Counts Two and Three of Plaintiff's Complaint as follows:

**I.      TO THE EXTENT MATTERS OUTSIDE THE PLEADINGS ARE SUBMITTED AND CONSIDERED, DEFENDANT RESPECTFULLY SEEKS PARTIAL SUMMARY JUDGMENT PURSUANT TO FED.R.CIV.P. 56 AS AN ALTERNATIVE TO DEFENDANT'S MOTION TO DISMISS.**

Initially, Defendant, Sears, moves pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss Plaintiff's claims for strict liability and breach of warranties found in Counts Two and Three of Plaintiff's Complaint, respectively. Alternatively, and to the extent matters beyond the pleadings have been submitted and are considered on this Motion, Defendant respectfully requests This Honorable Court treat the Motion as one for partial summary judgment.

Federal Rule of Civil Procedure 12(b) states, in relevant part:

> If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Fed.R.Civ.P. 56(b). *See also, Rose v. Bartle*, 871 F.2d 331, 339-43 (3d Cir. 1989); *Tawes v. Frankford Volunteer Fire Company*, 2005 U.S. Dist. LEXIS 786, *4-5 (D.Del. 2005) ("The element that triggers the conversion of a 12(b)(6) motion into a motion for summary judgment is a challenge to the sufficiency of the pleader's claim supported by extra-pleading material.") (*quoting* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* §1366 at 485 (2d ed. 1990 and 2003 Supplement).

## II.    STANDARD OF REVIEW

### A.    Motion to Dismiss.

When considering a motion to dismiss a complaint for failure to state a claim, the Court must accept as true all well-pled allegations in the complaint. *Carson v. Springfield Coll.*, Del.Super., 2006 WL 2242732, at *1 (Aug. 4, 2006). The standard is thus, taking all allegations as true, whether it is beyond doubt that the plaintiff can prove no set of facts to support his claim which would entitle him to relief. *McIntyre v. Division of Youth Rehabilitation Services*, 795 F.Supp. 668, 673 (D.Del. 1992) (citations omitted). "The issue involved in a motion to dismiss is not whether the plaintiff will ultimately prevail but whether he is entitled to present evidence in support of his claims." *McIntyre*, 795 F.Supp. at 673. In the present action, taking as true all allegations in Plaintiff's Complaint, Count Two of the Complaint must be dismissed for failing to state a claim upon which relief may be granted.

### B.    Motion for Partial Summary Judgment.

Federal Rule of Civil Procedure 56(c) provides that the moving party is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgments as a matter of law." Fed.R.Civ.P. 56.

A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). "Facts that could alter the outcome are material facts." *Charlton v. Paramus Bd. Of Educ.*, 25 F.3d 194, 197 (3d Cir. 1994). "Summary judgment will not lie if the dispute about a material fact is 'genuine', that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

2

When presented with a motion for summary judgment, a court must "review the record as a whole, drawing all reasonable inferences in favor of the non-moving party, while refraining from weighing the evidence or making credibility determinations." *Price v. Chaffinch*, D.Del., No. 04-956-GMS, 2006 WL 1313178 *1 (May 12, 2006) (slip op.) (*quoting Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). A court should enter summary judgment only if, upon all the "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, . . . there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Material facts are those which could alter the outcome of the case while a genuine dispute exists if a rational person could find that "the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assur. Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted).

The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 10 (1986). If the moving party has demonstrated an absence of material fact, the non-moving party then "must come forward with 'specific facts showing that there is a genuine issue for trial'." *Matsushita*, 475 U.S. at 587 (*quoting* Fed.R.Civ.P. 56(e)). The court will view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion. *Pennsylvania Coal Ass'n v. Babitt*, 63 F.3d 231, 236 (3d Cir. 1995). The non-moving party then must demonstrate that there is enough evidence that would permit a jury to rule in its favor on the very issue. *See Anderson*, 477 U.S. at 249.

In the present action, there is no genuine issue of material fact as to when the subject mower was first purchased from Defendant. As such, Count Three of the Complaint must be dismissed based upon the running of the applicable statute of limitations.

3

III.    **THE SUBSTANTIVE LAW OF THE STATE OF DELAWARE APPLIES TO DEFENDANT'S MOTION TO DISMISS AS WELL AS DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT.**

In analyzing the legal issues raised in this Motion, the substantive law of the State of Delaware controls. A federal court sitting in diversity must apply the substantive law of the state in which it sits. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). *See also, Schiavello v. Delmarva Systems Corporation*, 61 F.Supp.2d 110, 113 (D.Del. 1999) (applying Delaware state law in motion for summary judgment); *Ontario Hydro v. Zallea Systems, Inc.*, 569 F.Supp.1261, 1271 (D.Del. 1983) (applying Delaware state law in motion to dismiss for failure to state a claim).

IV.    **UNDER APPLICABLE DELAWARE LAW, THE CLAIMS SET FORTH IN COUNTS TWO AND THREE OF PLAINTIFF'S COMPLAINT ARE PRECLUDED AND THUS MUST BE DISMISSED.**

      A.    **Counts Two and Three of Plaintiff's Complaint are governed by Delaware's enactment of the Uniform Commercial Code, 6 Del.C. §2-101, *et seq.***

Section 2-105 of Delaware's enactment of the Uniform Commercial Code defines "goods" as:

> (1) "Goods" means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Article 8) and things in action.

6 Del.C. §2-105(1).

Furthermore, Section 2-102 of Delaware's Uniform Commercial Code sets forth the scope of the Code as follows:

> Unless the context otherwise requires, this Article [Article 2 – Sales] applies to transactions in goods....

6 Del.C. §2-102.

Based upon the definition of "goods" and the scope of Article 2 - Sales, the lawn mower that is the subject of the present action is a "good" within the scope of Delaware's Uniform Commercial Code. *See generally, Johnson v. Hockessin,* 420 A.2d 154 (Del. 1980) (applying U.C.C. to claims involving sale of farm tractor).

> **B.    Count Two of Plaintiff's Complaint fails to state a claim upon which relief can be granted as Delaware law does not recognize a cause of action for strict liability for allegedly defective goods.**

Count Two of Plaintiff's Complaint sets forth claims against Defendant for strict liability. However, under Delaware law, strict liability claims are not recognized for the sale of allegedly defective goods and, thus, Count Two should be dismissed with prejudice.

Strict tort liability, as set forth in Section 402A of the Second Restatement of the Law of Torts, is "aimed at remedying damages caused by defective products. *See Cline v. Prowler Industries of Maryland, Inc.*, 418 A.2d 968, 972 (Del. 1980). The Uniform Commercial Code, as adopted in the State of Delaware, has a similar aim. Incorporated into the Code are "provisions concerned with protecting the buyer and ultimate consumer from the hazards that may be produced by defective products", such as the implied warranties of merchantability and fitness for a particular purpose. *Cline*, 418 A.2d at 973. When confronted with these "doctrines of independent, yet parallel developments addressed to the protection of the consumer", the Supreme Court of Delaware, in *Cline,* performed a thorough analysis of the two competing doctrines and held that the U.C.C. is the "sole remedy beyond negligence in products liability cases involving sales transactions." *Id.* at 979. The Delaware Supreme Court's decision in *Cline* was based on: (i) that strict tort liability and the sales warranty theory underlying the U.C.C. are not completely separate entities; (ii) the U.C.C. does not expressly permit the development of competing theories outside of the Code; and (iii) the Delaware General Assembly intended that the U.C.C. preempt strict tort liability in the sales field of law. *Id.* at 978-80.

Delaware state and federal courts have consistently held that strict tort liability, with respect to cases involving the sale of allegedly defective goods, has been preempted by the adoption of the Uniform Commercial Code. *See Di Ienno v. Libbey Glass Div., Owens-Illinois, Inc.*, 668 F.Supp. 373, 376 (D.Del. 1987) ("[T]he judicially created doctrine of strict products liability has been preempted in Delaware, with respect to cases involving the sale of defective goods, by the Delaware General Assembly's adoption of the warranty provisions of the Uniform Commercial Code ('UCC')."); *Hansen v. Umtech Industrieservice Und Spedition*, 1996 U.S. Dist. LEXIS 10949, *43 (D.Del. 1996) ("Delaware does not recognize a claim for strict liability in tort arising out of the sale of a product, due to the adoption of the Uniform Commercial Code."); *Anderson v. Airco, Inc.*, 2004 Del.Super. LEXIS 210, *24-25 (Del.Supr.Ct. 2004) ("[T]he Delaware Supreme Court expressly rejected the doctrine of strict tort liability in the sales context.").

Under Delaware law, claims for strict liability for allegedly defective goods in sales cases are precluded by the U.C.C. As such, in the instant case, Plaintiff's Count Two fails to state a claim upon which relief can be granted and must be dismissed.

**C. Count Three of Plaintiff's Complaint is barred by the four-year statute of limitations set forth in Section 2-725 of Delaware's enactment of the Uniform Commercial Code.**

Count Three of Plaintiff's Complaint contains claims for breach of express and implied warranties. As set forth above, the instant matter involves the sales of goods and thus Plaintiff's claims are governed by Delaware's enactment of the Uniform Commercial Code. Section 2-725 of the Code states:

(1) An action for breach of any contract for sale must be commenced within 4 years after the cause of action has accrued. By the original agreement, the parties may reduce the period of limitations to not less than one year but may not extend it.

(2)     A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. **A breach of warranty occurs when tender of delivery is made,** except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

6 Del.C. §2-725 (emphasis added).

The four-year statute of limitations set forth in Section 2-725 applies equally to both express and implied warranties. *See Johnson v. Hockessin Tractor, Inc.*, 420 A.2d 154, 157 (Del. 1980) ("In every contract for sale, when the seller is a merchant, there are implied warranties. 6 Del.C. §2-314(1). Thus, under the U.C.C., implied warranties are part of the contract for sale. Consequently, a breach of an implied warranty must necessarily be a breach of the contract.") Additionally, the four-year statute of limitations found in Section 2-725 apply equally to both claims for economic damages, as well as personal injury. *Johnson*, 420 A.2d at 157-58 ("We hold, therefore, that all actions alleging breach of implied warranty are limited by the provisions of §2-725 ....").

Moreover, the time in which a breach of warranty accrues is the date that tender of delivery is made. 6 Del.C. §2-725. This date is more readily apparent when only one seller and one buyer are involved in the sale of the good. In the case where the seller tenders delivery of the allegedly defective good to the original owner, who subsequently sells the good to the party who is eventually injured by the good, the date on which the breach of warranty claim accrues is the date of delivery to the original owner. The statute of limitations for breach of warranty is not revived upon each successive sale of the good. *See Lecates v. Hertrich Pontiac Buick Co.*, 515 A.2d 163, 175 (Del. Super. Ct. 1986) ("A revivication theory would necessarily mean that every seller is exposed to the risk of warranty liability for the life of the goods or products sold. The period or repose assured by the statute of limitations would be a chimera, for the statute might

7

not expire until the product itself expires.") This issue was also addressed in *Sellon v. General Motors Corp.*, 571 F.Supp. 1094 (D.Del. 1983). In *Sellon*, the plaintiff purchased an automobile from his father, who originally purchased the automobile in 1973. As the plaintiff did not file suit until 1979, more than four years after the original purchase date, the court held plaintiff's breach of warranty claims time barred pursuant to Section 2-725 of the U.C.C. *Sellon*, 571 F.Supp. at 1097-1100. The date chosen for the accrual date was the date of the original purchase, not subsequent purchases. *See also, Dalton v. Ford Motor Company*, 2002 Del.Super., Lexis 132, *22 (Del Super. Ct. 2002) ("Since the automobiles were "tendered" when purchased, this is when the statute of limitations began to run as to any breach of warranty claims. Whether the time was 1991, 1992, 1993, or 1994, the Plaintiffs had four years within which to bring a claim for breach of implied warranty of merchantability, breach of express warranty or a breach of implied warranty of fitness for a particular purpose. Since the Plaintiffs did not bring their breach of warranty actions within the four year time limitation, the Plaintiffs' claims are barred as a matter of law.") (Defendant attaches hereto as Exhibit "B" all unreported decisions cited herein to assist the Court in its decision of this motion).

Applying the above principles to the instant action, Plaintiff's claims for breach of express or implied warranties are time barred by the four-year statute of limitations set forth in Section 2-725 of the U.C.C. In Paragraph 8 of Plaintiff's Complaint, Plaintiff avers that "[i]n or around 2004, the Sharkeys [Plaintiff's insured] obtained a pre-owned Sears lawn mower [the subject mower]....". However, conspicuously absent from Plaintiff's Complaint is any allegation that Plaintiff actually purchased the subject lawn mower from Defendant in 2004. In actuality, the subject lawn mower was sold by Defendant to the original owner of the lawn

8

mower in 1999. (*See*, Sears sales records attached hereto as Exhibit "A").[1] Sometime in 2004, the original owner either sold or otherwise relinquished the mower to Plaintiff's insured. Pursuant to 6 Del.C. §2-725, the date of accrual of any breach of express and implied warranty claims and thus the date from which the four-year statute of limitations began to run was in 1999. Any claim for breach of warranty by the original purchaser expired no later than 2003. Plaintiff's insured, as a subsequent purchaser, cannot gain any greater rights to a breach of warranty claim than the original purchasers. As Plaintiff did not file the Complaint until March 15, 2007, well after the four-year statute of limitations had already run, the claims for breach of express and implied warranties are stale and must be dismissed.

## V.    CONCLUSION

Counts Two and Three of Plaintiff's Complaint fail to state a cause of action upon which relief can be granted. The Plaintiff's claims for strict liability relative to the sale of an allegedly defective good are precluded by Delaware's enactment of the Uniform Commercial Code. Delaware law does not recognize a cause of action for strict tort liability involving the sale of goods and, thus, Count Two of Plaintiff's Complaint must be dismissed. As to Count Three of Plaintiff's Complaint for breach of express and implied warranties, the same is time-barred by the four-year statute of limitations set forth in Section 2-725 of the U.C.C. The date on which Plaintiff's claims for breach of warranty accrued was in 1999, and it is at this time that the four-year statute of limitations began to run. As Plaintiff's Complaint was filed on March 15, 2007, after the four-year statute of limitation had run, Count Three of Plaintiff's Complaint must be dismissed.

---

[1] The attached Exhibit is a print-out from Sears' computer database used to track goods sold by Sears. The document reflects a sales date of November 2, 1999. Although the Exhibit lists Lynn Sharkey as the owner of the subject lawn tractor, the Sharkeys were not the original purchasers. Lynn Sharkey was likely added to the Sears database as the owner in 2006 when the Sharkeys called Sears to service the lawn tractor.

WHEREFORE, Defendant, Sears, Roebuck and Company, prays that This Honorable Court enter an Order dismissing Counts Two and Three of Plaintiff's Complaint. In the alternative, and to the extent this Court has considered matters beyond the scope of the pleadings, Defendant, Sears, Roebuck and Company, respectfully prays This Honorable Court to enter an Order granting partial summary judgment as to Counts Two and Three.

Respectfully submitted,

COHEN, SEGLIAS, PALLAS, GREENHALL & FURMAN, P.C.

Robert K. Beste, Jr., Esquire (Bar I.D. 154)
Nemours Building, Suite 1130
1007 North Orange Street
Wilmington, DE 19801
(302) 425-5089

Of Counsel:

Frederick W. Bode III, Esquire
P.A. Bar I.D. No. 33391 (Admitted *pro hac vice)*
DICKIE, McCAMEY & CHILCOTE, P.C.
Two PPG Place, Suite 400
Pittsburgh, PA 15222
(412) 281-7272

DATED:       July 11, 2007

03739-001/10

10

Exhibit A

Page: 1 Document Name: untitled

```
NPJ26215- 50   NPS - View/update Serviceable Mdse Items List         06/19/07
Type the Action Code and Row Number below. Then press Enter.
Action code:     (1=Add item       2=View/change item   3=Delete item
                 4=Crt Site SO/Sears  5=Crt Shop SO/Sears  6=Display SO
Row Number :     7=Crt Site SO/A&E  8=Crt Shop SO/A&E  9=Crt Install SO)
 (S = 3rd Party Store Stock)
```

|                          | Home phone   Can also be reached at |
|--------------------------|--------------------------------------|
| LYNN SHARKEY             | (302)239-7080    (302)562-7166       |
| 3 JARRELL FARMS DR       |                              ET:     |

NEWARK        DE   19711 3060C0                    Segment CD
Cross Streets:

| Row | Mdse Description         | Model Number | Purch/ Recvd | Svc Type | Cvg | Cvg Exp Dt | Pnd Svc |
|-----|--------------------------|--------------|--------------|----------|-----|------------|---------|
| 001 | WINDOW RAC, 5300 BTU 10.8 | 58072056200  | 07/05/04     | SITE     | CC  |            |         |
| 002 | MOWER, RIDING            | 917270660    | 11/02/99     | SITE     | CC  |            |         |
| 003 | MITR SAW,10" W/LASR GUIDE | 13721229     | 12/19/05     | SHOP     | CC  |            |         |

Different Repair Address  N (Y/N) Override N (Y/N) Override Cd   (C=Contractor)

Enter  F1=Help  F3=Exit  F7=Bkwd  F8=Fwd  F12=Prev screen

Date: 6/19/2007 Time: 1:40:53 PM

Page: 1 Document Name: untitled

```
NPJ28207 - 44    NPS - Display/Update Service Merchandise Items      06/19/07
LYNN SHARKEY                                  (302)239-7080 Loc: 1 ET:   CC:H

To update, modify the info below otherwise, type action code and press Enter.
  Action code      (1=Audit information   2=Item agreement
                    3=Create site SO/Sears 4=Create shop SO/Sears
                    5=Create site SO/A&E   6=Create shop SO/A&E 7=Sub Component)
  Mdse code : MOWERRD1YR    Type:    Mdse desc  : MOWER, RIDING
  Brand . . . CRAFTSMAN                 Origination:
  Sears purchase   N  (Y/N)        Item Svc: Y  Item PA: Y  Item Install: N
  Purch date   11 02 1999          Received date  11 02 1999    Reason
  Purch loc              (unit #)   Installed date
  Model # . .  917270660           Serial # . . 111999C005291
  Usage type    R  (R=Residential C=Coml)    Last pitch:
  Promote PA   Y   Reason           Promote other Y   Reason
  Warranty   Expires (mm dd ccyy)  Reason   Length (# M/D/Y)
    Labor          11 02 2000                  0 D
    Parts          11 02 2000                  0 D
    Excep parts    11 02 2000                  0 D
  Latest SO:          Plan:        Exp:          # additional SP:
  Last PA Check:


  Enter  F1=Help  F3=Exit  F12=Prev screen
```

Date: 6/19/2007 Time: 1:41:11 PM

Exhibit B

LEXSEE 2004 DEL. SUPER. LEXIS 210

RICHARD V. ANDERSON, et. ux., Plaintiffs, v. AIRCO, INC., et al., Defendants

C.A. No. 02C-12-091 HdR

SUPERIOR COURT OF DELAWARE, NEW CASTLE

2004 Del. Super. LEXIS 210; CCH Prod. Liab. Rep. P17,054

March 16, 2004, Submitted
June 30, 2004, Decided

**SUBSEQUENT HISTORY:** Reargument granted by, in part *Anderson v. Airco, Inc.*, 2004 Del. Super. LEXIS 270 (Del. Super. Ct., Aug. 13, 2004)

**PRIOR HISTORY:** *Anderson v. Airco, Inc.*, 2003 U.S. Dist. LEXIS 13765 (D. Del., July 28, 2003)

**DISPOSITION:**    [*1]  DEFENDANTS' MOTIONS TO DISMISS DENIED IN PART AND GRANTED IN PART.

**COUNSEL:** Robert Jacobs, Esq. and David A. Arndt, Esq., Jacobs & Crumplar, P.A., Wilmington, Delaware, for Plaintiffs.

Matthew P. Donelson, Esq. and Joel M. Doner, Esq., Wilbraham, Lawler & Buba, P.C., Wilmington, Delaware, for Defendant Airco, Inc.

James W. Semple, Esq., Morris, James, Hitchens & Williams, LLP, Wilmington, Delaware, for Defendant Air Products & Chemicals, Inc.

Albert Manwaring, IV, Esq. and Joseph S. Naylor, Esq., Pepper Hamilton, LLP, Wilmington, Delaware, for Defendant Allied Signal, Inc.

John L. Reed, Esq. and Gary W. Lipkin, Esq., Duane Morris, Wilmington, Delaware, for Defendants American Chemistry Council, B.F. Goodrich Corp., Conoco Inc., The Dow Chemical Company, Epec Polymers Inc., ICI Americas, Inc., PPG Industries, Inc., Pactiv Corp., PolyOne Corporation, Shell Oil Co., Tenneco Inc., Tenneco Automotive, Inc., Union Carbide Corp., Uniroyal Inc. and Zeneca, Inc.

Michael P. Kelly, Esq., McCarter & English, LLP, Wilmington, Delaware, for Defendant Bayer CropScience Inc.

Randall E. Robbins, Esq., Ashby & Geddes, Wilmington, Delaware, for Defendant Borden Chemical, Inc.

[*2] Adam C. Balick, Esq., Balick & Balick, Wilmington, Delaware, for Defendant Bridgestone/Firestone, Inc.

John D. Balaguer, Esq. and William L. Doerler, Esq., White & Williams, Wilmington, Delaware, for Defendants Chevron USA Inc., Gulf Oil Corp. and Monsanto Company.

Frederick L. Cottrell, II, Esq. and Alyssa Schwartz, Esq., Richards, Layton & Finger P.A., Wilmington, Delaware, for Defendant Occidental Oxychem.

Jeffrey L. Moyer, Esq. and Anne Shea Gaza, Esq., Richards, Layton & Finger P.A., Wilmington, Delaware, for Defendant Formosa Plastics Corporation.

Somers S. Price, Jr., Esq. and W. Harding Drane, Jr., Esq., Potter, Anderson & Corroon LLP, Wilmington, Delaware, for Defendant Gencorp and Olin Corp.

Donald E. Reid, Esq., Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, for Defendant Georgia-Pacific Corp.

Kevin J. Connors, Esq., Marshall, Dennehey, Warner, Coleman & Goggin, Wilmington, Delaware, for Defendant The Goodyear Tire & Rubber Company.

James P. Hall, Esq., Phillips, Goldman & Spence, Wilmington, Delaware, for Defendant Society of Plastics Industry, Inc.

Richard D. Allen, Esq., Morris, Nichols, Arsht & Tunnell, for Defendant [*3] Westlake Vinyls Inc.

2004 Del. Super. LEXIS 210, *; CCH Prod. Liab. Rep. P17,054

David C. Malatesta, Jr., Esq., Kent and McBride, P.C., Wilmington, Delaware, for Defendant Whittaker Corporation.

JUDGES: Henry duPont Ridgely, President Judge.

OPINION BY: Henry duPont Ridgely

OPINION

## ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTIONS TO DISMISS

Now, therefore, for the reasons stated in the Opinion filed this date, IT IS ORDERED THAT:

> 1. Counts Two, Four, and Five of the Complaint filed by Richard V. and Sheri R. Anderson are dismissed as to Defendants The American Chemistry Council, Conoco, Inc., B.F. Goodrich Company, ICI Americas, Inc., PolyOne Corp., PPG Industries, Inc., Shell Oil Co., Uniroyal, Inc. and Zeneca, Inc.

> 2. In all other respects, the Defendants' motions to dismiss are denied.

/s/ Henry duPont Ridgely

President Judge

Dated: June 30, 2004

OPINION

RIDGELY, PRESIDENT JUDGE

Plaintiff Richard V. Anderson and his wife, Sheri R. Anderson, have filed this civil action against Airco, Inc., and thirty-five other defendants. [1] The Andersons seek compensatory and punitive damages for injuries allegedly sustained as a result of prolonged workplace exposure to vinyl chloride monomer ("VCM"), [*4] a chemical compound manufactured, marketed, and utilized by various representatives active in the polyvinyl industry.

> 1 The other defendants are as follows: Air Products and Chemicals, Inc.; Allied Signal, Inc.; The American Chemistry Council; Bayer Cropscience, Inc.; B.F. Goodrich Company; Borden Chemical, Inc.; Bridgestone/Firestone, Inc.; Chevron U.S.A., Inc.; Condea Vista Company; Conoco, Inc.; The Dow Chemical Company; Epec Polymers Inc.; Formosa Plastics Corporation; Gencorp; Georgia-Pacific Corporation; The

Goodyear Tire and Rubber Company; Gulf Oil Corporation; ICI Americas, Inc.; Monsanto Company; Occidental Oxychem; Olin Corporation; Pactiv Corporation; Pantasote, Inc.; PolyOne Corporation; PPG Industries, Inc.; Sasol North America, Inc.; Shell Oil Company; Society of the Plastics Industry, Inc; Tenneco, Inc.; Tenneco Automotive, Inc.; Union Carbide Corporation; Uniroyal, Inc.; Westlake Vinyls, Inc.; Whittaker Corporation; and Zeneca, Inc.

A majority of the defendants have filed motions to dismiss. [*5] Three motions to dismiss are before the Court and I will address each of these motions in this opinion. The first motion is a consolidated motion filed by Defendants The American Chemistry Council; Conoco Inc.; B.F. Goodrich Company; [2] ICI Americas, Inc.; PolyOne Corporation; PPG Industries, Inc.; Shell Oil Company; Uniroyal, Inc.; and Zeneca, Inc. (collectively "Consolidated Defendants"). [3] The two remaining motions to dismiss have been individually filed by Defendants Georgia-Pacific Corporation and the Society of the Plastics Industry, Inc. ("SPI"). [4]

> 2 In their pleadings, Consolidated Defendants have identified, among the others "ConocoPhillips Company" and "Goodrich Corporation" as moving defendants. In the interests of accuracy and consistency, the Court instead has followed the original case caption, which lists "Conoco, Inc.," and "B.F. Goodrich Company."

> 3 A joinder has been filed by Honeywell International Inc. who has not been identified in the caption of this case. No stipulation or motion has been filed to address the identification of Honeywell as a successor of Allied Signal, Inc. Pending any such amendment, I decline to address any joinder of Honeywell.

[*6]

> 4 Georgia-Pacific is sued individually in Count Three, while SPI is named in Counts Four through Eight. Because Count Three raises issues unique to Georgia-Pacific, it is addressed separately from those raised by the other defendants in this opinion. SPI's contentions, however, do not warrant independent treatment, and thus are incorporated into Consolidated Defendants' motion to dismiss.

For the reasons set forth below, the motions are denied in part and granted in part. I first hold that federal law does not preempt the Andersons' state common law claims. The negligence claims in Counts One and Three are not subject to dismissal because the Andersons have pled with particularity each element of the common law

Page 3

2004 Del. Super. LEXIS 210, *; CCH Prod. Liab. Rep. P17,054

tort of negligence. Similarly, because the Andersons have sufficiently alleged each element of the torts of conspiracy and aiding and abetting, Counts Six and Seven will not be dismissed. Count Eight, asserting a derivative cause of action for loss of consortium, therefore also survives the motions to dismiss.

Counts Two, Four, and Five, on the other hand, each fail to state a cause [*7] of action upon which relief may be granted. Count Two is dismissed because Delaware law applies to this case and a claim of strict products liability is not recognized here. Finally, Counts Four and Five which involve alleged fraud are dismissed because the Andersons have failed to allege with particularity facts showing reliance by Anderson or facts showing an intent by the moving defendants to induce action by him.

## I. BACKGROUND

From 1986 to 1993, Plaintiff Richard V. Anderson was employed by the Georgia Gulf Corporation, a subsidiary of Georgia-Pacific and manufacturer and marketer of chlorovinyl products. In 2002, Anderson contracted glioblastoma multiform, a type of brain cancer, allegedly as a result of handling VCM compounds at the company's plant in New Castle, Delaware. In December 2002, Anderson, along with his wife, Sheri R. Anderson, filed suit against Consolidated Defendants, Georgia-Pacific, SPI (collectively "Defendants"), and others not involved in this motion, alleging eight instances of tortious conduct on the part of all defendants, who variously comprise suppliers, marketers, and manufacturers in the vinyl compound industry. [5] Specifically, the Andersons [*8] allege: negligent failure to warn of the known hazards of VCM (Count One); strict products liability (Count Two); negligent and intentional failure of Georgia-Pacific individually to provide a safe workplace (Count Three); reckless failure to provide sufficient warning of the dangers of VCM (Count Four); fraudulent concealment and misrepresentation of the dangers of VCM (Count Five); conspiracy to commit fraud, misrepresentation, and fraudulent concealment of the dangers of VCM (Count Six); aiding and abetting the alleged fraudulent concealment (Count Seven); and loss of consortium (Count Eight).

> 5  The Complaint further groups all Defendants into two categories: (1) "Supplier Defendants"-- Airco, Conoco, PolyOne, PPG, Shell, and Georgia-Pacific; and (2) "Non-Supplier Defendants" -- Airco, American Chemistry Council, Conoco, Georgia-Pacific, B.F. Goodrich Company, ICI, PolyOne, PPG, Shell, SPI, Uniroyal, and Zeneca. The former are alleged to have supplied the VCM that Anderson handled at the Georgia Gulf plant. The Andersons accuse the Non-Supplier Defen-

dants, referred to in the Complaint as "Conspiring Defendants," of conspiring to conceal the hazards of VCM. See Pl. Compl. P3, at 5 (Dec. 11, 2002).

[*9]  The Andersons claim that Defendants collectively engaged in an industry-wide campaign to conceal the ill effects of VCM exposure, and that, in particular, Anderson's brain cancer was caused by his unprotected handling of this compound. Vinyl chloride monomer ($C_2H_3Cl$) is a colorless gas used primarily in the production of polyvinyl chloride (PVC) homopolymer and copolymer resins, a construction-related material used in, among other applications, flooring and piping. [6] A known carcinogen, several studies have linked prolonged exposure to VCM to various forms of cancer. [7] The compound is also addressed in the *Occupational Safety and Health Act of 1970* ("OSHA"), [8] the *Clean Air Act of 1970*, [9] and accompanying federal regulations. [10]

> 6  *See Vinyl Chloride Monomer,* Georgia Gulf Product Information, *available at* http://www.ggc.com/docs/products/el/vcm_info.pdf (describing VCM's chemical properties and outlining its commercial applications)(last visited June 24, 2004).

> 7  *Report on Carcinogens, Tenth Edition,* U.S. Department of Health and Human Services, Public Health Service, National Toxicology Program (Dec. 2002), *available at* http://ehp.niehs.nih.gov/roc/tenth/profiles/s186viny.pdf. *See also* Kathleen M. Rest & Nicholas A. Ashford, *Regulation and Technological Options: The Case of Occupational Exposure to Formaldehyde,* 1 HARV. J. LAW & TEC. 63, 76-77 (1988) (recounting congressional and industrial response to the dangers of vinyl chloride and the latter's remedial actions)(last visited June 24, 2004).

[*10]
> 8  *29 U.S.C. §§ 651-678.*

> 9  *See 42 U.S.C. § 7412(b)(1)* (providing list of "hazardous air pollutants," including vinyl chloride).

> 10  *See 29 C.F.R. § 1910.1017* (regulating exposure limits, medical surveillance, signs and labels, and other aspects of the production of vinyl chloride).

The Andersons originally filed this action in Superior Court, Defendants removed the case in January 2003 to the United States District Court for the District of Delaware, [11] claiming questions of federal law predominated the Andersons' complaint. In an Order dated July

2004 Del. Super. LEXIS 210, *; CCH Prod. Liab. Rep. P17,054

28, 2003, the District Court remanded the case to this Court. [11] Defendants then filed the pending motions to dismiss.

11  See 28 U.S.C. § 1441.

12  *Anderson v. Airco, Inc., 2003 U.S. Dist. LEXIS 13765 (D. Del.).*

## II. STANDARD OF REVIEW

[*11] A Rule 12(b)(6) motion to dismiss requires the Court to determine whether the plaintiff may recover under any reasonably conceivable set of circumstances susceptible to proof under the complaint. [13] Dismissal is warranted where the plaintiff has failed to plead facts supporting an element of the claim, or that under no reasonable interpretation of the facts alleged could the complaint state a claim for which relief might be granted. [14] Although the trial court need not "accept every strained interpretation of the allegations[,]" a plaintiff is "entitled to all reasonable inferences that logically flow from the face of the complaint." [15] As a general rule, vagueness and lack of detail are insufficient grounds for dismissal. [16]

13  *Evans v. Perillo, 2000 Del. Super. LEXIS 243, at *5-6.*

14  *Id.*

15  *Malpiede v. Townson, 780 A.2d 1075, 1083 (Del. 2000).*

16  *Evans, 2000 Del. Super. LEXIS 243, at *6.*

Special rules of pleading apply to claims [*12] of fraud, negligence, or mistake under Delaware Civil Rule 9(b). A complaint alleging fraud, negligence, or mistake must state with particularity the showing the condition of mind. [17] In the fraud context, a plaintiff must refer to the time, place, and contents of the false representations, as well as the identity of and benefit to the person making the alleged misrepresentations. [18] To sufficiently plead negligence, a defendant must be put on notice of what duty was breached, who breached it, the breaching act, and the party upon whom the act was performed. [19]

17  SUPER. CT. CIV. R. 9(b).

18  *Nutt v. A.C. & S., Inc., 466 A.2d 18 (Del. Super. Ct. 1983); see also Autrey v. Chemtrust Industries Corp., 362 F. Supp. 1085, 1092, 1093 (D. Del. 1973).*

19  *Myer v. Dyer, 542 A. 2d 802 (Del. Super. Ct. 1987).*

## III. CONSOLIDATED DEFENDANTS' MOTION TO DISMISS

### A. Preemption

Consolidated Defendants first claim that federal workplace safety laws [*13] preempt all of the Andersons' allegations of misconduct. They argue that their cause of action comprises, in essence, a claim of inadequate warnings, a subject specifically addressed by federal law. In response, the Andersons contend that the federal safety legislation is not meant to supercede all state tort law. According to the Andersons, their claims are grounded in state common law and do not implicate any federal regulatory scheme.

OSHA is designed to remedy the "substantial burden" that "personal injuries and illnesses arising out of work situations impose [on] interstate commerce in terms of lost production, wage loss, medical expenses, and disability compensation payments." [20] In regulating workplace safety, Congress sought, inter alia, to encourage states "to assume the fullest responsibility for the administration and enforcement of their occupational safety and health laws [. . ., and] to improve the administration and enforcement . . ." of such laws. [21] Workplace standards for vinyl chloride are controlled generally through the Hazard Communication Standard ("HCS"), [22] and directly by way of other federal regulations. [23] Because federal law regulates this aspect [*14] of VCM handling, any state labeling law to the contrary is unenforceable. [24]

20  *29 U.S.C. § 651[(a)]* (no subsection designation in original).

21  *Id. § 651(b)(11).*

22  *29 C.F.R. § 1910.1200* (ensuring that the "hazards of all chemicals produced or imported are evaluated, and that information concerning their hazards is transmitted to employers and employees.").

23  *See id. § 1910.1017(b)(1)* (regulating signs and labeling of vinyl chloride operations).

24  *See generally Gade v. National Solid Wastes Management Assoc., 505 U.S. 88, 96-97, 120 L. Ed. 2d 73, 112 S. Ct. 2374(1992); Ferdinand S. Tinio, Annotation, Pre-emptive Effect of Occupational Safety and Health Act of 1970 and Standards Issued Thereunder, 88 A.L.R. Fed. 833 (2004). See also Manufacturers Asso. of Tri-County v. Knepper, 801 F.2d 130 (3d. Cir. 1986)*

2004 Del. Super. LEXIS 210, *; CCH Prod. Liab. Rep. P17,054

(holding that HCS preempts Pennsylvania hazardous-substance outreach-program regulation to the extent it applied to disclosure of workplace hazards in manufacturing sector); ~~New Jersey State Chamber of Commerce v. Hughey, 774 F.2d~~ 587 (3d. Cir. 1985) (preempting state statute mandating disclosure of substances that may pose environmental hazards).

[*15] In determining whether a state action is preempted by the federal law, the Court must look to the congressional intent behind the federal provisions in issue. [25] As the District Court noted in its remand order in this case, the traditional police powers of the states will not be superceded by a federal act absent a "clear and manifest purpose of Congress" to do so. [26] In the context of OSHA, Congress has expressly saved two areas from federal preemption. [27] First, Congress directed that:

> nothing in this Act shall be construed to supersede or in any manner affect any workmen's compensation law or to enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment. [28]

Congress also noted that the Act does not "prevent any State agency or court from asserting jurisdiction under State law over any occupational safety or health issue with respect to which no standard is in effect." [29]

25  Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 208, 85 L. Ed. 2d 206, 105 S. Ct. 1904 (1985).

[*16]

26  Anderson v. Airco, 2003 U.S. Dist. LEXIS 13765, at *5, quoting Wisconsin Public Intervenor v. Mortier, 501 U.S. 597, 605, 115 L. Ed. 2d 532, 111 S. Ct. 2476 (1991).

27  See Gade, 505 U.S. at 96-97.

28  29 U.S.C. § 653(b)(4).

29  Id. § 667(a).

In support of their argument, Consolidated Defendants point to numerous decisions from a variety of jurisdictions detailing the extent that state warning laws have been preempted by regulations issued under OSHA's authority. [30] Unlike the claims in these cases, however, the Andersons have raised here a theory of

tortious conduct based on common law principles of negligence and fraud. By directing that OSHA shall not be construed to "enlarge or diminish . . . the common law . . . rights, duties, or liabilities of employers and employees . . . ," Congress signaled an intent to leave state law tort actions intact. [31] Because the Andersons' inadequate warning claims are grounded in tort law, not administrative labeling requirements, [32] OSHA does not preempt any count of the complaint. [*17]

30  See, e.g., United Steelworkers v. Auchter, 763 F.2d 728 (3d. Cir. 1985) (discussing preemptive effect of HazCom Standard on state hazard disclosure laws in manufacturing sector); In re Wireless Tel. Radio Frequency Emissions Prods. Liab. Litig., 248 F. Supp. 2d 452, 461 (D. Md. 2003) (noting that congressional intent controls determination of preemptive effect).

31  Cf. Aetna v. Davila, No. 02-1845,  U.S. (June 21, 2004), 159 L. Ed. 2d 312, 124 S. Ct. 2488, 2004 U.S. LEXIS 4571 (holding federal retirement insurance legislation preempts similar state statute because of congressional intent to furnish private remedy exclusively in federal courts).

32  Cf. Papas v. Upjohn Co., 985 F.2d 516, 518 (11th Cir. 1993) (preempting state law defective labeling action under federal insecticide legislation's labeling and packaging standards); Hawkins v. Leslie's Pool Mart, Inc., 184 F.3d 244, 251 (3d. Cir. 1999) (rejecting state action that sought labeling "different from that approved by the EPA . . . ." under same federal insecticide legislation).

[*18]  Furthermore, Consolidated Defendants' present claim that the "preemption doctrine requires dismissal of this state-law tort action" is identical to the federal jurisdiction argument raised in the U.S. District Court. [33] In its remand order, the U.S. District Court expressly held that the Andersons' claims are not preempted by the labeling standards of OSHA. [34] The Consolidated Defendants thus failed to establish "either that federal law creates the cause of action or that the plaintiff's right to relief reasonably depends on resolution of a substantial question of federal law." [35] Therefore, it necessarily follows that the federal legislation does not preempt the Andersons' state-law claims.

33  Def. Mot. to Dismiss, at 5.

34  Anderson, 2003 U.S. Dist. LEXIS 13765, at *6-7 ("The Court finds that the state tort laws at issue have not been preempted by the HazCom

Page 6

2004 Del. Super. LEXIS 210, *; CCH Prod. Liab. Rep. P17,054

Standard or the VCM warning and labeling standard.").

35  *Elf Aquitaine, Inc. v. Placid Oil Co.*, 624 F. ~~Supp. 994, 997 (D. Del. 1985).~~

### [*19] B. Negligent Failure to Warn

Separately, the Supplier Defendants contend that the Andersons' negligence claims in Count One must be dismissed because Anderson has failed to establish a causal link between his injuries and any particular defendant's activity. According to the Supplier Defendants, the Complaint fails to inculpate the particular defendants that manufactured or supplied the VCM that allegedly caused Anderson's condition.

The Andersons disagree, emphasizing that the Complaint establishes each supplier has the duty to provide VCM in a manner that ensures its subsequent safe handling. The Supplier Defendants breached this duty, according to the Andersons, by failing to provide sufficient information regarding proper handling procedures and by actively concealing this information from them.

The parties cite several cases for their respective positions. In *Money v. Manville Corporation Asbestos Disease Compensation Fund*, several employees of Delmarva Power and Light filed suit against various manufacturers of asbestos products, alleging a number of torts, including negligence. [36] After the close of the plaintiffs' evidence, the Superior Court granted a directed [*20] verdict in favor of the manufacturers. Specifically, the Court held that, in the absence of expert medical testimony "providing a direct nexus between the defendants' asbestos products and plaintiffs' asbestos-related injuries," the plaintiffs had failed to establish a prima facie case on the issue of causation. [37]

36  *596 A.2d 1372 (Del. 1991).*

37  *Id.* at 1374 (recounting the Superior Court's reasoning).

Similarly, in *Lipscomb v. Champlain Cable Corporation*, the Superior Court granted summary judgment in favor of an asbestos manufacturer. [38] According to the Court, the plaintiff-employee failed to establish a proper "product nexus" -- the "factual connection in space and time between a particular plaintiff and a particular defendant's product." [39] The employer in *Lipscomb* handled two types of piping, only one of which contained asbestos. Because he failed to offer any evidence as to which particular pipe he handled, the Court found that Lipscomb could not prove causation. [*21] [40]

38  *Lipscomb v. Champlain Cable Corp.*, 1988 Del. Super. LEXIS 338 (adopting Master's Report).

39  ~~*Id.* at *1. See also Nutt v. A. C. & S. Co., 517~~ A.2d 690, 692 (Del. Super. Ct. 1986) (analyzing product nexus in the summary judgment context, and ~~holding that a plaintiff must offer "some evidence that not only was a particular defendant's~~ asbestos containing product present at the job site, but also that the plaintiff was in proximity to that product at the time it was being used.") (citing *In re Asbestos Litigation, 509 A. 2d 1116 (Del. Super. Ct. 1986)*).

40  *Id.* at *6. For the same reasons, the Court also found an insufficient causal link between Lipscomb's asbestos-related injury and the claim that he handled "unknown sheets of asbestos paper." *See id.*

Finally, in *Threadgill v. Manville Corporation Asbestos Disease Compensation Fund*, another asbestos-exposure case, the Delaware District Court denied a motion for a new trial after [*22] a jury returned a verdict in favor of the defendant asbestos manufacturer. [41] There the District Court noted that "the jury was free to conclude on this record that plaintiffs had failed to establish [a] product nexus" because there was no evidence "explicitly placing Mr. Threadgill in proximity to Manville's asbestos-containing products at the time those products were being used." [42] Because the plaintiff's case was "entirely circumstantial," the District Court refused to disturb the jury's verdict. [43]

41  *Threadgill v. Manville Corp. Asbestos Disease Compensation Fund, 1990 U.S. Dist. LEXIS 19083 (D. Del.).*

42  *Id.* at *8.

43  *Id.*

I find that all three cases are distinguishable, at this stage of the proceeding. Initially, I note that I must review the Complaint to determine whether under any reasonable interpretation of the facts alleged could the Andersons state a claim, and if so, whether each element of the negligence claim is properly pled. *Money*, *Lipscomb*, and [*23] *Threadgill* were decided at the directed verdict, summary judgment, and post-trial stages of litigation, respectively. In each case, discovery was complete or at least commenced, and in one a verdict had been returned. All three are similar, moreover, in that the plaintiffs had an opportunity to present at least part of their evidence in countering their opponents' attacks.

2004 Del. Super. LEXIS 210, *; CCH Prod. Liab. Rep. P17,054

Here, the Court is reviewing only the sufficiency of the Complaint.

Substantively, Count One of the Complaint alleges that the "supplier defendants were negligent in that they did not give any warning of the hazards known to them," promoted "representations that denied and underestimated the harm of VCM," and failed to conduct "scientific and medical tests to examine and eliminate the hazards of the products they sold, manufactured, and distributed . . . ." [44] Through this language, the Andersons have sufficiently alleged the four elements of a negligence action: duty (here, the obligation to warn), the breaching party (the supplier defendants, who are specifically named at the outset of the Complaint), the breaching act (failing to warn), and the injured party (Anderson). In the Complaint, the Andersons need [*24] not prove proximate cause because they need not prove their case at this stage of litigation. Accordingly, dismissal at this stage is inappropriate.

44  Pl. Compl. P11.

### C. Strict Products Liability

Count Two of the Complaint asserts a claim of strict products liability against the Supplier Defendants, alleging that the VCM Anderson was exposed to was "defective and unreasonably dangerous" by virtue of its toxicity and carcinogenicity. [45] The Supplier Defendants, according to the Andersons, are strictly liable for Anderson's injuries because of their failure to warn of such dangers. In response, the Supplier Defendants maintain that Delaware does not recognize a strict tort liability in causes of action based on the sale of goods.

45  Id. P13.

In Cline v. Prowler Industries of Maryland, the Delaware Supreme Court expressly [*25] rejected the doctrine of strict tort liability in the sales context. [46] Concerned that it "would be engaging in impermissible judicial legislation," the Court held that Delaware's version of the Uniform Commercial Code [47] preempted any strict liability claim. [48] The Andersons, however, claim that Delaware law does not apply to their claim, asserting instead that the "places where the tortious conduct leading to injury occurred were in the states where the [Supplier] Defendants caused their literature to be created and in the States where [they] had their various meetings." [49]

46  418 A.2d 968 (Del. 1980); see also LeJeune v. Bliss-Salem, Inc., 85 F.3d 1069, 1071 (3d Cir. 1996) (contrasting Pennsylvania and Delaware products liability jurisprudence).

47  6 Del. C. § 1-101, et seq.

48  Cline, 418 A.2d at 974. See also Anita Berstein, The New-Tort Centrifuge, 49 DEPAUL L. REV. 413, 425 (1999) (comparing the historical rise of strict liability in tort with the subsequent UCC scheme that "codified the law of warranties, disclaimers, and third-party beneficiaries.").

[*26]

49  Pl. Resp. at 27.

In determining which jurisdiction's law applies to a cause of action sounding in tort, Delaware courts follow the tenets of the Restatement (Second) of Conflict of Laws. [50] Section 145 provides: "The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in [Section 6]." [51] Whether a significant relationship attaches to a particular jurisdiction depends upon seven policy considerations enumerated in Section 6:

> (1) the needs of the interstate and international systems;
>
> (2) the relevant policies of the forum;
>
> (3) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;
>
> (4) the protection of justified expectations;
>
> (5) the basic policies underlying the particular field of law;
>
> (6) certainty, predictability and uniformity of result; and
>
> (7) ease in the determination and application of the [*27] law to be applied. [52]

Furthermore, Section 145 lists the following relational and geographic contacts a court should consider when applying the above factors:

> (a) the place where the injury occurred;
>
> (b) the place where the conduct causing the injury occurred;
>
> (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and
>
> (d) the place where the relationship, if any, between the parties is centered. [53]

2004 Del. Super. LEXIS 210, *; CCH Prod. Liab. Rep. P17,054

The Restatement, in addition to these wide-ranging considerations, provides a specific framework for personal injury actions:

> In an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in [the Section 6 policy considerations] to the occurrence and the parties, in which event the local law of the other state will be applied. [54]

Thus, where the tortious conduct and injury occur in different jurisdictions, the state that has the most significant relationship to the action is generally the [*28] one in which the plaintiff was injured. [55]

50  See Travelers Indem. Co. v. Lake, 594 A.2d 38 (Del. 1991). See also Symeon C. Symeonides, The Judicial Acceptance of the Second Conflicts Restatement: A Mixed Blessing, 56 MD. L. REV. 1248, 1252, t.1 (1997) (surveying the forty-one jurisdictions, including Delaware, that have abandoned the lex loci delicti rule for tort conflicts).

51  RESTATEMENT (SECOND) OF CONFLICT OF LAWS, § 145(1).

52  Id. § 6; see also Lake, 594 A.2d at 47.

53  RESTATEMENT, supra n. 41, § 145(2).

54  Id. § 146.

55  Id. § 146 cmt. e. In choosing which laws to apply, Courts favored the situs of injury well before the first Restatement's adoption in 1934. See, e.g., Cameron v. Vandergriff, 53 Ark. 381, 13 S.W. 1092 (Ark. 1890); Le Forest v. Tolman, 117 Mass. 109 (1875) ("The act which is the cause of the injury and the foundation of the action must at least be actionable or punishable by the law of the place in which it is done, if not also by the law of the place in which redress is sought.") (citing Smith v. Condry, 42 U.S. 28, 11 L. Ed. 35 (1843)). But cf. Ehrenzweig, The Place of Acting in Intentional Multistate Torts, 36 MINN. L. REV. 1 (1951) (favoring the application of local

law of state where conduct occurred); Rheinstein, The Place of Wrong, 19 TULANE L. REV. 4 (1944) (advocating the same).

[*29] The Andersons claim that the Supplier Defendants' actions outside of Delaware resulted in a national deception of VCM workers. They contend that these interstate activities, in turn, engendered a significant relationship to the locus of production, i.e., production and marketing decisions made in Kentucky, Louisiana, and Texas led directly to Anderson's condition. In this case, the alleged injury occurred in Delaware at Anderson's place of employment. Similarly, the Supplier Defendants delivered VCM to the Georgia Gulf plant in Delaware. Even assuming arguendo that some wrongful conduct occurred at the site of production, this fact is outweighed by the subsequent interactions between the parties and events in Delaware. [56] I am persuaded that Delaware has the most significant relationship to the occurrence at issue and the parties in this case. Because Delaware law applies and does not recognize a claim of strict products liability, Count Two of the Complaint must be dismissed.

56  See RESTATEMENT, supra n. 41, § 146 cmt. e ("The local law of the state where the personal injury occurred is most likely to be applied when the injured person has a settled relationship to that state . . . .").

[*30] D. Fraud

The remainder of the Complaint alleges an industry-sponsored campaign to mislead the public about the health effects of vinyl chloride exposure. [57] Count Four, titled "Recklessness and Conduct of Defendants," sets out a broad timeline of events concerning the Non-Supplier Defendants and their activities within the vinyl chloride industry. The Andersons allege that these parties agreed, over a span of thirty years, to make public false statements regarding VCM through several industry-wide agreements. Specifically, the Andersons recount meetings concerning SD-56, a vinyl chloride safety data sheet promulgated by the Manufacturing Chemists Association ("MCA") in 1953, as well as medical and experimental worker testing allegedly designed to conceal the carcinogenicity and other effects of vinyl chloride exposure. According to the Andersons, these actions "caused inaccurate and insufficient information regarding [vinyl chloride] to be available and but for this, [Anderson] would not have been injured." [58]

57  Count Three, asserting a claim solely against Georgia-Pacific, is addressed in Section IV, infra.

[*31]

58  Pl. Compl. P76, at 42.

Case 1:07-cv-00153-JJF    Document 9-3    Filed 07/11/2007    Page 10 of 46

Page 9

2004 Del. Super. LEXIS 210, *; CCH Prod. Liab. Rep. P17,054

Count Five, titled "Fraud of the Defendants," alleges that an MCA-sponsored epidemiological study of the vinyl chloride industry, commissioned in 1966, was compromised by various activities of the Non-Supplier Defendants. Stemming from "improper sponsor influence," the value of "delay . . . to the vinyl chloride industry," and a dearth of "public [and] governmental interest in the hazards posed by . . . vinyl chloride monomer," [59] the study was repeatedly delayed and ultimately voted down by an MCA committee attended by representatives of various Non-Supplier Defendants. [60] Because the MCA and the Non-Supplier Defendants "specifically voted not to spend any money at all on trying to find the cause of the disease in the future," [61] Anderson contends he relied on "faulty" information which ultimately caused his injury.

[59]  Id. P77, at 42.

[60]  The Andersons claim that present at this meeting were the agents of "at least" Olin Corporation, Union Carbide Corporation, 3M, DuPont, Dow Chemical Company, and Uniroyal, Inc.

[*32]

[61]  Id. P90, at 47-48.

Delaware's fraud jurisprudence requires that a plaintiff allege: (1) a false representation, usually one of fact, that was made by the defendant; (2) with knowledge or belief of its falsity or with reckless indifference to the truth; (3) with an intent to induce action or inaction; (4) plaintiff's response is taken in justifiable reliance on the representation; and (5) an injury results from such reliance. [62] Relatedly, these elements also comprise a claim of fraudulent concealment, except that a plaintiff must allege a deliberate concealment by the defendant. [63] Failure to allege any of the elements warrants dismissal of the claim. [64]

[62]  See, e.g., Stephenson v. Capano Development, Inc., 462 A.2d 1069, 1074 (Del. 1983) (recounting fraud's elements at common law and discussing each requirement in depth); see generally PROSSER AND KEETON ON THE LAW OF TORTS 725, 728 (5th ed. 1984).

[63]  Nicolet v. Nutt, 525 A.2d 146, 149 (Del. 1987) (citing Stephenson, 462 A.2d at 1074).

[*33]

[64]  Zerby v. Allied Signal Inc., 2001 Del. Super. LEXIS 16 (dismissing fraud and other claims against defendant vinyl chloride manufacturers).

Although Rule 12(b)(6) "should not be read to impose a requirement that certain magic words be repeated throughout a Complaint," [65] Rule 9(b) requires that the circumstances constituting fraud be alleged with particularity. [66] This requirement serves to allow defendants to prepare an effective response and defense, eliminate complaints "filed as a pretext for discovery," and to protect defendants from "unfounded charges of wrongdoing" injurious to their "reputation and goodwill." [67]

[65]  Snyder v. Butcher & Co., 1992 Del. Super. LEXIS 362, at *19.

[66]  SUPER. CT. CIV. R. 9(b) (directing that fraud be alleged with "particularity").

[67]  C.V. One v. Resources Group, 1982 Del. Super. LEXIS 943.

In their Complaint, the Andersons [*34] fail to state how the Non-Supplier Defendants intended Anderson to act or refrain from acting. Similarly, the Complaint does not indicate any reliance on a specific representation made by the Non-Supplier Defendants. The Andersons can only allege a general reliance, based solely on information sources promulgated throughout the industry. [68] Although the Complaint specifies the time, place, and contents of the alleged false representations involving several, but not all, of the Non-Supplier Defendants, within the vinyl chloride industry, there is no allegation of any representation to Anderson directly or indirectly as an employee of any Non-Supplier Defendant or of a company supplied with defendants products. [69] General allegations of fraud are insufficient. [70] Consistent with this Court's ruling in Zerby, [71] I hold that Counts Four and Five fail to state a cause of action.

[68]  See Pl. Compl. P91, at 48 (Anderson "relied on the information available to him when he worked at the [Georgia Gulf plant] and as a result of the misinformation . . . was injured.") (emphasis added); id. P99, at 50 (Anderson "was made aware of the levels of VCM that were allegedly safe as published by [the Non-Supplier] defendants. He was made aware of a low risk of only liver cancer at the levels of his exposure and relied on this information to his detriment.") (emphasis added).

[*35]

[69]  Zerby, 2001 Del. Super. LEXIS 16, at *20-21 ("The fact, if it is a fact, that the non-supplier defendants fraudulently concealed or misrepresented the dangers of vinyl chloride with the intent to deceive and mislead and to be relied upon by Ms. Zerby and persons like Ms. Zerby whose employment responsibilities exposed them to vinyl chloride, does not state a cause of action where plaintiff was not employed by defendant or

Page 10

2004 Del. Super. LEXIS 210, *; CCH Prod. Liab. Rep. P17,054

a company supplied with defendant's products.")
(quotation marks omitted).

70   See Strasburger v. Mars, Inc., 46 Del. 274, 7
Terry 274, 83 A. 2d 101, 104 (Del. 1951).

71   2001 Del. Super. LEXIS 16.

E. Conspiracy and Aiding and Abetting

Counts Six, "Conspiracy to Commit Fraud and Mis-representation and Concealment by All Defendants," and Seven, "Aiding and Abetting," reiterate the fraud narrative in Count Five, specifically linking both the Supplier and Non-Supplier Defendants to the industry events concerning VCM safety. Although the Andersons cannot maintain their fraud claims, their conspiracy and aiding and abetting [*36] allegations are viable.

Nicolet v. Nutt, a conspiracy action stemming from asbestos-related injuries, holds that:

if competent medical evidence as to the dangers of asbestos was intentionally misrepresented and suppressed in order to cause plaintiffs to remain ignorant thereof, coupled with proof that such suppression caused injury to a plaintiff, the alleged tort [of conspiracy] is established. [72]

This reasoning has been adopted in the vinyl chloride context. [73] Accordingly, if proved, the Andersons would be entitled to relief under the Complaint.

72   Nicolet v. Nutt, 525 A.2d 146, 148 (Del. 1987).

73   Zerby, 2001 Del. Super. LEXIS 16, at *24 (holding that if non-suppliers of vinyl chloride "conspired with the suppliers to misrepresent and suppress vinyl chloride's dangers, all the conspirators, including the non-supplier conspirators, can be held liable.").

As to aiding and abetting, the Restatement provides:

For harm resulting to a third [*37] person from the tortious conduct of another, one is subject to liability if he . . . knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself . . . . [74]

In alleging that the Non-Supplier Defendants deliberately plotted to conceal the health risks surrounding VCM exposure, the Andersons have sufficiently pled the three elements that comprise aiding and abetting: tortious conduct, knowledge, and substantial assistance. [75] As to the first element, the Complaint sufficiently alleges negligence as the underlying wrong supporting the derivative conspiracy and aiding and abetting claims. [76] In addition, in setting forth its litany of conspiratorial events and accusing the Non-Supplier Defendants of designing and implementing a comprehensive plan of secrecy, the Complaint adequately alleges the latter two elements of aiding and abetting. Accordingly, Count Seven will not be dismissed under Rule 12(b)(6).

74   RESTATEMENT (SECOND) OF TORTS, § 876(b), adopted by Patton v. Simone, 1992 Del. Super. LEXIS 316.

[*38]

75   Patton, 1992 Del. Super. LEXIS 316, at *22.

76   See Nutt v. A. C. & S. Co., 517 A.2d 690, 694 (Del. Super. Ct. 1986) ("Civil conspiracy is not an independent cause of action in Delaware, but requires an underlying wrong which would be actionable absent the conspiracy."); McLaughlin v. Copeland, 455 F. Supp. 749, 752 (D. Del. 1978), aff'd 595 F.2d 1213 (3d. Cir. 1979).

F. Loss of Consortium

Count Eight asserts a claim on behalf of Mrs. Anderson for damages due to loss of consortium. Because the negligence and conspiracy counts remain, the consortium claim survives as well. [77]

77   See Jones v. Elliott, 551 A. 2d 62, 64-65 (Del. 1988); Lacy v. G. D. Searle & Co., 484 A.2d 527 (Del. Super. Ct. 1984).

IV. GEORGIA-PACIFIC'S MOTION TO DISMISS

The Complaint's third count alleges that [*39] Georgia-Pacific, as parent company of Anderson's employer, Georgia Gulf, negligently or intentionally exposed Anderson to unsafe levels of VCM "as a result of the manufacturing facilities Georgia-Pacific designed and controlled and provided to Georgia Gulf . . . ." [78] Because the company governed the "health and safety" and "disclosures of medical effects of VCM" at Georgia Gulf "through about 1986," Georgia-Pacific "caused [Anderson] to be exposed to high levels of VCM . . . ." [79]

78   Pl. Compl. P20, at 14.

79   Id. PP19-20.

Page 11

2004 Del. Super. LEXIS 210, *; CCH Prod. Liab. Rep. P17,054

Georgia-Pacific seeks dismissal on several grounds. First, it takes issue with the timing alleged in the complaint. Specifically, Georgia-Pacific notes that Anderson was employed by Georgia Gulf's predecessor, Ethyl Corporation, for several months in 1983, thus making his employment allegations inaccurate. Since it did not purchase Ethyl's plant until late 1983, Georgia-Pacific insists it could not have controlled the dissemination of information regarding VCM, and therefore [*40] cannot be held liable for Anderson's injuries. For the years Anderson was employed by Georgia Gulf, Georgia-Pacific contends that Delaware's workers' compensation laws bar any direct claim against it. [80] The company also argues that the Andersons' claims are general and conclusory, devoid of the factual circumstances surrounding Georgia-Pacific's control of Georgia Gulf.

> [80] *See 19 Del. C. § 2304.*

The purpose of the workers' compensation law is to give an injured employee "a prompt and sure means of receiving compensation and medical care without subjecting that worker to the hazards and delays of a lawsuit." [81] Compensation for injuries sustained in the course of employment is thus controlled solely by this statutory scheme, "regardless of the question of negligence and to the exclusion of all other rights and remedies." [82]

> [81] *Frank C. Sparks Co. v. Huber Baking Co., 48 Del. 9, 9 Terry 9, 96 A.2d 456 (Del. 1953).*
>
> [*41]
>
> [82] *19 Del. C. § 2304.*

The viability of the Andersons' cause of action against Georgia-Pacific, as parent company to Anderson's direct employer, Georgia Gulf, thus turns on the relationship of the parties within the meaning of the workers' compensation laws. The term *employer* is defined as "all those who employ others unless they are excluded from the application of this chapter by any provision of" the workers' compensation laws. [83] The definition of *employee*, a term that has "probably produced more reported cases than any definition of status in the modern history of law," [84] is conceptually more problematic.

> [83] *19 Del. C. § 2301(10).*
>
> [84] 3 ARTHUR LARSON & LEX K. LARSON, LARSON'S WORKERS' COMPENSATION LAW § 60.01 (2003). *See also Harris v. Seiavitch, 336 Pa. 294, 9 A.2d 375 (Pa. 1939); RESTATEMENT OF AGENCY (SECOND) § 220* (defining "servant" as a "person employed to perform services in the affairs of another and who with respect to the physical conduct in the per-

formance of the services is subject to the other's control or right to control.").

[*42]   Courts generally follow the common-law distinction between employee and independent contractor. [85] In Delaware, the four elements of the test are: (1) who hired the employee; (2) who may discharge the employee; (3) who pays the employee's wages; and (4) who has the power to control the conduct of the employee when he is performing the particular job in question. [86] Although the rules are firmly established, their application to the numerous circumstances that may arise under them remains elusive. [87] But however nuanced the application of the rule is, it is well-settled that where one is determined to be an employee, the workers' compensation laws preempt any common-law remedy against the employer for personal injury. [88]

> [85] *See RESTATEMENT OF AGENCY (SECOND) § 220(2)* (listing factors for consideration).
>
> [86] *Lester C. Newton Trucking Co. v. Neal, 58 Del. 55, 204 A.2d 393, 395, 8 Storey 55 (Del. 1964); Hering v. Central Grain, 1999 Del. Super. LEXIS 156; see also White v. Gulf Oil Corp., 406 A.2d 48 (Del. 1979)* (holding that statutory definitions in workers' compensations laws do not abrogate common-law concepts governing employer-employee relationship).
>
> [*43]
>
> [87] *See, e.g., Murray's Case, 130 Me. 181, 154 A. 352, 354 (Me. 1931)* ("No hard and fast rule can be made as to when one undertaking to do work for another is an independent contractor or an employee within the meaning of a *Workmen's Compensation Act*, but each case must be determined on its own facts.").
>
> [88] *Powell v. Interstate Vendaway, Inc., 300 A.2d 241 (Del. Super. Ct. 1972).*

On a motion to dismiss, the Court need not "blindly accept as true all allegations, nor must it draw all inferences from them in plaintiffs' favor unless they are reasonable. . . ." [89] In determining whether the Andersons would be entitled to relief under any "any set of facts that might be shown to exist consistent with the well-pleaded allegations in the complaint," [90] the Court must be satisfied that the Complaint contains more than conclusory and generalized accusations. [91] The Andersons contend that Georgia-Pacific controlled the operations, including the safety protocols, of the plant in which Anderson worked. When taken in the context of the Complaint's broad allegations [*44] of negligence against the Supplier Defendants, Count Three inculpates Georgia-

2004 Del. Super. LEXIS 210, *; CCH Prod. Liab. Rep. P17,054

Pacific, as owner and controller of Georgia Gulf, in the negligent failure of the Supplier Defendants to provide a safe working environment. If true, Georgia-Pacific could be considered Anderson's employer, or as a dual-employer concurrent with Georgia Gulf. [92] But under the workers' compensation exclusionary provisions, this state of affairs would disallow any claim for personal injury against Georgia-Pacific. [93]

>   89  *Grobow v. Perot, 539 A.2d 180, 187 (Del. 1988), overruled on other grounds, Brehm v. Eisner, 746 A.2d 244 (Del. 2000).*
>
>   90  *In re Tri-Star Pictures, 634 A. 2d 319 (Del. 1993).*
>
>   91  *Loudon v. Archer-Daniels-Midland Co., 700 A. 2d 135 (Del. 1997); Grobow, 539 A.2d at 187.*
>
>   92  *Loden v. Getty Oil Co., 316 A.2d 214, 216 (Del. Super. Ct. 1974), citing* 1A LARSON'S WORKERS' COMPENSATION LAW 839, § 48.40 (recognizing dual-employment relationships for purpose of workers' compensation).
>
>   93  *See 19 Del. C. § 2304.*

[*45] For Georgia-Pacific to be immune from suit by virtue of this principle, however, the Court must find that Anderson is in fact an employee of the parent company. Delaware law recognizes the individuality of corporate entities. [94] Moreover, the fact that two corporations have a common central management and control does not override or negate the separate identity of the corporations. [95] Thus, whether Anderson can be considered an "employee" of Georgia-Pacific is controlled by the four employment criteria set forth in *Neal*. At this stage of litigation, however, the details of Anderson's

relationship, if any, with Georgia-Pacific are insufficiently developed to warrant analysis under this test. As the Complaint serves only a notice function, in this context, the Andersons need not prove their case within it. The allegations in Count Three therefore provide little factual guidance for the Court in determining, for example, who hired Anderson or from which accounts his pay is drawn. [96] On the present record, application of the *Neal* test is premature. Accordingly, dismissal of Count Three is unwarranted at this stage of litigation.

>   94  *Stauffer v. Standard Breads, Inc., 40 Del. Ch. 202, 178 A.2d 311 (Del. Ch. 1962), aff'd 41 Del. Ch. 7, 187 A.2d 78 (Del. 1962).*
>
> [*46]
>   95  *Skouras v. Admiralty Enterprises, Inc., 386 A.2d 674 (Del. Ch. 1978).*
>
>   96  *Cf. Jordan v. E.I. du Pont De Nemours & Co., 1986 Del. Super. LEXIS 1371, at *2 (Del. Super. Ct. 1986)* (discussing details of "working relationship" between defendants contractor and subcontractor and analyzing parties' relationship under *Neal); Loden, 316 A.2d 214* (examining employment relationship in the context of *Neal*).

## V. CONCLUSION

As to Counts One, Three, Six, Seven, and Eight, the Defendants' motions to dismiss are *DENIED*. As to Counts Two, Four and Five, Defendants' motions to dismiss are *GRANTED*. An order will be entered consistent with this opinion.

/s/ Henry duPont Ridgely

President Judge

*Westlaw.*

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2242732 (Del.Super.)
**(Cite as: 2006 WL 2242732 (Del.Super.))**

Page 1

**C**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware,
New Castle County.
Dennis D. CARSON, Plaintiff,
v.
SPRINGFIELD COLLEGE Wilmington, Delaware
Campus, Defendant.
**C.A. No. 05C-10-002-PLA.**

Submitted: June 14, 2006.
Decided: Aug. 4, 2006.

**Background:** Former college student brought action
against private college, alleging violation of his right
of free speech. College filed motion to dismiss.

**Holdings:** The Superior Court, Ableman, J., held
that:
 (1) private college was not acting as a State actor
when it had student escorted from college property,
and
 (2) college acted within its rights in ejecting student
for making threats of violence on its campus.
 Motion to dismiss granted.

West Headnotes

**[1] Colleges and Universities** ☜⎯⎯⎯9.30(2)
81k9.30(2) Most Cited Cases

**[1] Constitutional Law** ☜⎯⎯⎯2011
92k2011 Most Cited Cases
 (Formerly 92k90.1(1.4))
Private college was not acting as a State actor when it
had student escorted from college property by a
college security guard for comments made in class to
another student, and thus student could not maintain
action against college for violation of his First
Amendment right of free speech; even if college
received federal funds, higher education was not a
traditionally exclusive public function, student's
ejection was not in reaction to any State regulatory
scheme, and student's ejection was not made under
the color of State authority. U.S.C.A. Const.Amend.
1.

**[2] Colleges and Universities** ☜⎯⎯⎯9.30(2)
81k9.30(2) Most Cited Cases
Private college acted within its rights in ejecting
student for making threats of violence on its campus,
even if student's words were not sufficient to sustain
a criminal conviction for terroristic threatening.
 Upon Defendant Springfield College's Motion to
Dismiss Plaintiff's First Amendment Claim (Count II
of the Amended Complaint) **GRANTED.**

Dennis D. Carson, Pro Se.

 Andrew D. Cordo, Esquire, Wilmington, Delaware,
Attorney for Defendant.

ABLEMAN, J.

*1 Before the Court is Defendant Springfield
College's Motion to Dismiss Plaintiff's claim for
relief under the First Amendment of the United States
Constitution for failure to State a claim upon which
relief can be granted. Because Plaintiff would not be
entitled to a recovery under the facts he has pled,
even if all are accepted as true, Defendant's Motion to
Dismiss is GRANTED.

**I. Statement of Facts**
 Plaintiff Dennis Carson ("Plaintiff" or "Carson") was
a student for two semesters at Springfield College
("the College"), a private educational institution. On
April 6, 2005, the College allegedly informed
Plaintiff that at the end of the semester, he would no
longer be allowed to continue his studies because he
lacked requisite experience in his field of study.
Carson, upset by the College's decision, later
commented in class to another student, "what I feel
like doing today is going home and putting bullets in
my fifteen M14 rifle clips." The course instructor, a
former State police officer, overheard the comment
and escorted Carson from the building with the
assistance of a College security guard. Plaintiff later
filed this action arguing that the College's refusal to
permit him to continue his studies constitutes a
breach of contract, and that his removal from the
building was a violation of his right to free speech
under the First Amendment to the United States
Constitution. Now before the Court is the College's
motion to dismiss Count II of Plaintiff's Amended
Complaint.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2242732 (Del.Super.)
(Cite as: 2006 WL 2242732 (Del.Super.))

## II. Analysis

A court may not dismiss a plaintiff's complaint for failure to state a claim unless it appears to a certainty that the plaintiff may not recover under any set of facts that would entitle him to relief. [FN1] In evaluating a motion to dismiss, the court's review is limited to the well-pleaded allegations in the complaint, which must be accepted as true. [FN2] In the instant case, even accepting all of plaintiff's non-conclusory allegations in Count II as true, his First Amendment claim fails as a matter of law.

> FN1. *Spence v. Funk*, 396 A.2d 967 (Del.1978); *Nix v. Sawyer*, 466 A.2d 407 (Del.Super.Ct.1983); *Battista v. Chrysler Corp.*, 454 A.2d 286 (Del.Super.Ct.1982).

> FN2. *Barni v. Kutner*, 76 A.2d 801 (Del.1950).

The First Amendment to the United States Constitution states in relevant part: "Congress shall make no law ... abridging the freedom of speech." [FN3] Although the guarantees in the First Amendment apply only to acts of Congress, [FN4] those protections have been extended to include State actions by the Fourteenth Amendment, which provides that, "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States ...," as well as 42 U.S.C. § 1983. [FN5]

> FN3. U.S. Const. amend. I.

> FN4. See, e.g., *Pub. Util. Comm'n of the Dist. of Columbia v. Pollak*, 343 U.S. 451, 461, 72 S.Ct. 813, 96 L.Ed. 1068 (1952).

> FN5. 42 U.S.C. § 1983 provides in part: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress

While the Fourteenth Amendment and Section 1983 do extend constitutional protection to include State action, as a matter of substantive constitutional law,

"most rights secured by the Constitution are protected only against infringement by governments." [FN6] That is to say, the First Amendment cannot prohibit private conduct unless "there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." [FN7] The Supreme Court has mandated careful adherence to this requirement because it "preserves an area of individual freedom by limiting the reach of federal law." [FN8] The core issue before the Court, therefore, is whether the College's acts may fairly be treated as that of the State. [FN9]

> FN6. *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978).

> FN7. *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001) (citations omitted).

> FN8. *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 936, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982).

> FN9. The Court notes that Plaintiff cited a number of cases for the purposes of illustrating that individuals may sue private entities for violations of the First Amendment. Plaintiff's cases were inapposite, however, because in each case the entity in question was a public school, operated and funded by the State, e.g., *San Filippo v. Bongiovanni*, 961 F.2d 1125 (3rd Cir.1992)(involving Rutgers, the State University of New Jersey); *Bd. of Regents of Univ. of Wisconsin Sys. v. Southworth*, 529 U.S. 217, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000).

*2 A private entity's actions may be attributable to the State if: (1) the private entity exercises powers that are traditionally exclusively reserved to the State [FN10] (the public function test); (2) the State exercised such coercive power that the private actor was compelled to act as it did [FN11] (the state compulsion test); or (3) the State is intimately involved in the challenged private conduct so as to be a joint participant [FN12] (the symbiotic relationship test). [FN13]

> FN10. *Flagg Bros.*, 436 U.S. at 149.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                          Page 3
Not Reported in A.2d, 2006 WL 2242732 (Del.Super.)
(Cite as: 2006 WL 2242732 (Del.Super.))

FN11. *Jackson v. Metro. Edison Co.*, 419
U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477
(1974).

FN12. *Burton v. Wilmington Parking Auth.*,
365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45
(1961).

FN13. The Third Circuit Court of Appeals,
as well as the District Court for the District
of Delaware, have recognized and applied
these tests for the purposes of determining
whether private action may be treated as that
of the State. *See Jordan v. Fox, Rothschild,
O'Brien & Frankel*, 20 F.3d 1250 (3rd
Cir.1994); *Thompson v. Cmty. Action of
Greater Wilmington, Inc.*, 567 F.Supp. 1159
(D.Del.1983).

[1] Plaintiff cannot establish that the College is a
State actor under the public function test. The public
function test requires that the private entity exercise
powers that are traditionally exclusively reserved to
the State, such as holding elections, [FN14] or
exercising eminent domain. [FN15] Higher education
is not a traditionally exclusive public function. This is
due to the fact that many private entities, the College
among them, operate for educational purposes. The
mere fact that a private entity serves the public, or
that its services overlap with those provided by the
State, does not make the conduct in question
attributable to the State. [FN16]

FN14. *Flagg Bros.*, 436 U.S. at 149.

FN15. *Jackson*, 419 U.S. at 352.

FN16. *Rendell-Baker v. Kohn*, 457 U.S. 830,
842, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982).

Plaintiff is similarly unable to establish that the State
exerted coercive power such that the act of the
College must be considered to be that of the State.
This test requires that the act be the product either of
State coercion or significant encouragement. [FN17]
This is generally the case where a State enacts
regulatory requirements with which private entities
must comply. [FN18] The College's action in
ejecting Plaintiff was not in reaction to any State
regulatory scheme, nor can Plaintiff demonstrate that
the College otherwise acted at the State's behest.

FN17. *Blum v. Yaretsky*, 457 U.S. 991, 102
S.Ct. 2777, 73 L.Ed.2d 534 (1982).

FN18. *Id.*

Finally, Plaintiff cannot establish that the College
was a state actor under the symbiotic relationship
test. Pursuant to this test, the actions of a private
party constitute state action if the State has "so far
insinuated itself into a position of interdependence
with [the private party] that it must be recognized as
a joint participant in the challenged activity." [FN19]
Plaintiff makes two arguments for state action under
this test. First he argues that the College is a state
actor because a number of students pay their tuition
at the College with loans obtained from the federal
government. The Supreme Court, however, has
consistently held that financial aid to an institution,
without more, is not sufficient to elevate a private
entity's conduct to the level of state action. [FN20] In
*Rendell-Baker v. Kohn*, the institution in question, a
nursing home, received money directly from the
government. The State subsidized the operating and
capital costs of the home, and paid the medical
expenses of more than 90 percent of the patients. In
this case, an unknown number of students
independently applied for, and received, loans from
the federal government to finance their education.
However, even if the College received this money
directly from the federal government, instead of from
the students, that fact is insufficient to transform the
College's private actions into State action.

FN19. *Burton*, 365 U.S. at 725.

FN20. *Rendell-Baker*, 457 U.S. at 842.

*3 Plaintiff additionally alleges that the State should
be considered a joint participant because the College
instructor that escorted him from the building had
formerly been employed as a state police officer. The
instructor, however, was acting as an employee of the
College, not under the color of State authority.
Indeed, the instructor, as a *former* police officer, had
no ability to invoke State power.

[2] Finally, the Court notes that the First
Amendment does not protect all speech. Specifically,
the First Amendment does not protect "those words,
which by their very utterance inflict injury or tend to
incite an immediate breach of the peace." [FN21]
More specifically, the First Amendment does not
protect threats of violence. [FN22] Finally, although
Plaintiff contends that his words were not sufficient
to sustain a criminal conviction for terroristic
threatening, the Court notes that a fundamental
element of private property is the right to regulate
access to it. [FN23] The College was well within its

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2242732 (Del.Super.)
(Cite as: 2006 WL 2242732 (Del.Super.))

rights to exclude Plaintiff for making threats of violence on its campus.

> FN21. *Virginia v. Black*, 538 U.S. 343, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003) (citations omitted).

> FN22. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992).

> FN23. *Kaiser Aetna v. United States*, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979); *Int'l News Serv. v. Assoc. Press*, 248 U.S. 215, 250, 39 S.Ct. 68, 63 L.Ed. 211 (1918) (Brandeis, J., dissenting).

### III. Conclusion

For all the foregoing reasons, the Defendant's Motion to Dismiss Count II is hereby **GRANTED.** Accordingly, the August 28, 2006 hearing has been removed from the Court's calendar.

IT IS SO ORDERED.

Not Reported in A.2d, 2006 WL 2242732 (Del.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE 2002 DEL. SUPER. LEXIS 132

GLADYS DALTON, PAUL WARWICK, CATHLEEN ROBERTS HOWARD, TERRY & EILEEN BROPHY, CAROL DeFEO, CLEARTIS ROCHESTER, DAVID WHOSTON, and ALBERT G. SACHS Individually, and as representatives of all persons similarly situated, Plaintiffs, v. FORD MOTOR COMPANY, Defendant.

C.A. No. 00C-09-155 WCC

SUPERIOR COURT OF DELAWARE, NEW CASTLE

*2002 Del. Super. LEXIS 132*

September 26, 2001, Submitted
February 28, 2002, Decided

**DISPOSITION:** [*1] Defendants' Motion to Dismiss Granted.

**COUNSEL:** Christian J. Singewald, Esquire, White & Williams LLP, Wilmington, Delaware, Attorney for Defendant.

Robert Jacobs, Jacobs & Crumplar, P.A., Wilmington, Delaware, Attorney for Plaintiffs.

**JUDGES:** Judge William C. Carpenter, Jr.

**OPINION BY:** William C. Carpenter, Jr.

**OPINION**

**MEMORANDUM OPINION**

**CARPENTER, J.**

*INTRODUCTION*

The Plaintiffs have filed a putative class action lawsuit against Ford Motor Company alleging claims of negligence, breach of express and implied warranties, unjust enrichment, fraud, deceit, and a federal Magnuson-Moss Act violation. Ford Motor Company has filed a motion to dismiss Gladys Dalton's (the representative of a putative class of plaintiffs) First Amended Complaint pursuant to Superior Court Civil Rule 12(b)(6) for failure to state a claim upon which relief can be granted. For the reasons set forth below, Ford's motion to dismiss will be granted.

*FACTS*

Gladys Dalton, Paul Warwick, Cathleen Roberts Howard, Terry & Eileen Brophy, Carol DeFeo, Cleartis Rochester, David Whoston, and Albert G. Sachs (hereinafter "the Plaintiffs") have brought this action against the Defendant, Ford Motor Company [*2] (hereinafter "Ford") seeking to recover damages for Ford's alleged negligence, breach of express warranty, breach of an implied warranty of merchantability and fitness for a particular purpose, unjust enrichment, fraud, deceit, and a Magnuson-Moss Warranty Act violation. The Plaintiffs are alleged victims of a putative class, who purchased 1991 through 1994 Ford Mercury Tracers or in the alternative, Ford Escorts, in Delaware, Maryland, and West Virginia.

In 1992, Ford conducted a field study, and discovered that there was a potential defect in Ford Escorts and Mercury Tracers, model years 1991 through 1994. Apparently, a wiring defect in the vehicles' fuel tank was found to potentially cause damage, which in turn, could cause a fire. To be more specific, when the vehicles came in contact with water, and salt water spray, during winter driving, the salt water combination could apparently corrode the vehicle, which would cause an electrical short resulting in damage to the vehicle. When Ford discovered this potential defect, it recalled these particular automobiles in selected states, including Pennsylvania, New Jersey and Ohio. All but one of the Plaintiffs in this action, reside [*3] in Delaware, Maryland or West Virginia, and consequently did not receive notice of this potential defect, nor were their vehicles included in the Ford recall. [1] When this action was commenced, the Plaintiffs had continued to own and operate their Ford vehicles, the possible electrical short had not ever occurred, and it appears that the Plaintiffs had not attempted to re-sell their vehicles.

2002 Del. Super. LEXIS 132, *

1  One plaintiff, Carol DeFeo, resides in Chester County, Pennsylvania, one of the states where Ford conducted a public recall.

---

The heart of this complaint asserts that Ford had a duty to notify all purchasers of Ford Escorts and Mercury Tracers about this "potential danger," and that all the vehicles should have been recalled or minimally repaired by Ford. Because of this failure to recall or repair the potentially defective fuel tank wiring, the Plaintiffs assert that they have suffered damages in the decreased value of their vehicles. [2] Specifically the Plaintiffs alleged negligent design and manufacturing, breach of [*4] warranty, unjust enrichment, fraud, and Magnuson-Moss violations.

2  Plaintiffs' Amended Complaint at P28.

In response, Ford delineates numerous grounds upon which this Court should bar each of the Plaintiffs' claims and grant Ford's motion to dismiss the Plaintiffs' Amended Complaint. The litigation is now in a procedural posture to consider the Defendant's motion. The Court will first address the statute of limitations issues raised in the motion and then will address the remaining issues to the extent necessary. [3]

3  On September 21, 2000 the Plaintiffs filed their initial complaint, which was followed by a Motion to Dismiss. On February 23, 2001, after several other procedural motions were filed, the Plaintiffs filed a Motion to Amend their First Complaint. On March 7, 2001, the Court granted the Plaintiffs' Motion to Amend their Complaint, and Ford was ordered to re-submit its Motion to Dismiss.

[*5] STANDARD OF REVIEW

In evaluating a motion to dismiss, pursuant to Superior Court Civil Rule 12(b)(6), this Court must accept all well-pleaded allegations as true. [4] The test, which determines whether the facts alleged are sufficient to withstand a motion to dismiss, is a broad one and therefore, a plaintiff may recover under any reasonably conceivable set of circumstances susceptible of proof under the complaint. [5] However, this Court, will only "assume the truthfulness of all well-pleaded (i.e., non conclusory) allegations of the complaint for purposes of the motion." [6] "Conclusions asserted in the complaint . . . will only be accepted as true if there are specific allegations of fact to support them." [7]

4  Spence v. Funk, 396 A.2d 967, 968 (Del. Super. 1978)(citing Laventhol, Krekstein, Horwath

& Horwath v. Tuckman, 372 A.2d 168 (Del. 1976)).

5  396 A.2d at 968 (citing Klein v. Sunbeam Corp., 47 Del. 526 (Del. 1952)).

6  In re Dean Witter Partnership Litigation, 1998 Del. Ch. LEXIS 133, No. 14816, 1998 WL 442456, at *4 (Del. Ch. July 17, 1998).

[*6]

7  Id.

DISCUSSION

I. Statute of Limitations

A. Negligence Claims

The statute of limitations for a negligence cause of action can be found in 10 Del. C. § 8106. That statute specifically provides that a claim "shall [not] be brought after the expiration of 3 years from the accruing of the cause of such action . . . ." [8] Delaware courts have uniformly held that the statute of limitations begins to run when the alleged wrongful act was committed, [9] and ignorance of the facts, which lead to the accrual of the action, is ordinarily not an obstacle to the application of the statute of limitations. [10] Since the landmark case of Layton v. Allen, [11] however, this seemingly bright line bar for recovery has been slowly lowered to allow particular types of actions, which are (1) "inherently unknowable," and (2) "sustained by a blamelessly ignorant plaintiff." [12] Alternatively, if a plaintiff can show fraudulent concealment, then the plaintiff may go forward on a claim, which would be otherwise barred by 10 Del. C. § 8106 [*7] .

8  10 Del. C. § 8106.

9  Consolidated American Insurance Co., v. Chiriboga, 514 A.2d 1136, 1137-1138 (Del. Super. 1986)(citing Mastellone v. Argo Oil Corporation, 82 A.2d 379, 383 (Del. 1951)).

10  David B. Lilly Co. v. Fisher, 18 F.3d 1112, 1117 (3rd Cir. 1994); Curran v. Time Ins. Co., 644 F. Supp. 967, 972 (D.Del. 1986).

11  246 A.2d 794 (Del. 1968).

12  David B. Lilly Co., 18 F.3d at 1117 (citing Kaufman v. C.L. McCabe & Sons, Inc., 603 A.2d 831, 835 (Del. 1992); Isaacson, Stolper & Co., 330 A.2d 130, 133 (Del. 1974) (noting that the "application of the 'time of discovery' rule is limited, and each case must stand or fall on its own

2002 Del. Super. LEXIS 132, *

facts, and those facts will determine whether it is an exception [to the general rule].")).

First, it is clear that unless an exception to the general statute of limitations statute is applicable, [*8] the Plaintiffs' negligence claims are barred as a matter of law. The Plaintiffs purchased their Ford vehicles between seven and ten years ago but did not file their litigation until September 21, 2000, well beyond the three year time limitation. [13]

> 13    See Keller v. President, Dirs. & Co. of Farmers Bank, 24 A.2d 539 (1942)(holding that statutes of limitation begin to run when the proper parties are in existence capable of suing and being sued. . .); Abramson v. Delrose, Inc., 132 F. Supp. 440 (D. Del. 1955); See also Dofflemeyer v. W.F. Hall Printing Co., 558 F.Supp 372 (D.Del. 1983)(holding that under this section, the 3-year period does not begin to run until the cause of action has accrued, which begins when the right to institute a suit arises.).

Recognizing that the statute would normally bar these claims, the Plaintiffs assert, in an attempt to challenge this harsh outcome, that they were not aware of the alleged defect until 1999, which is when it "manifested [*9] itself," thus triggering the statute of limitations. Therefore, the Plaintiffs argue that the "time of discovery" exception to the statute of limitations applies. Alternatively, the Plaintiffs assert that Ford fraudulently concealed this alleged defect in their vehicles which also would toll the statute until the defect was discovered.

The time of discovery rule provides that "injuries or conditions which are inherently unknowable postpone the commencement of the statute of limitations period until the victim discovered or should have discovered the wrong." [14] In this instance, the inquiry is whether the alleged wiring defect was inherently unknowable to the Plaintiffs, and if it was, the question then becomes when did the Plaintiffs learn of the defect, or when could they have reasonably known about the wiring defect in their respective vehicles. [15]

> 14    J.V. Hodges v. Smith, 517 A.2d 299 (Del. Super. 1986)(citing Layton v. Allen, 246 A.2d 794 (Del. 1968); Isaacson, Stolper & Co., v. Artisans Saving Bank, 330 A.2d 130 (Del. Super. 1974); Rudginski v. Pullella, 378 A.2d 646 (Del. Super. 1977)).

[*10]
> 15    J.V. Hodges, 517 A.2d at 301.

This litigation's principal claim relates to a wiring defect in the fuel tank area, which when exposed to certain adverse environmental conditions, could cause an

electrical system malfunction, resulting in a possible fire. It appears that until the malfunction occurred there would be no indication to an unsuspecting driver that a defect was present, nor was there any action that the owner could have taken to discover the defect. Further, it does not appear that the announcement of the alleged defect was widely distributed to the public, nor would it be one known to a reasonably informed consumer. The recall was limited in scope, and there does not appear to be any attempt to warn others by public pronouncement, beyond the recall area. Under this factual backdrop, it is difficult to accept Ford's argument that the Plaintiffs had the ability or "capacity" to learn of the defect simply because Ford publicly notified others. Of course, since none of the Plaintiffs vehicles have developed a defect, it is difficult to clearly ascertain when the potential [*11] problem, which is the subject of this litigation, surfaced to their attention. The Court suspects this revelation, which allegedly occurred in 1999, was attorney generated for the sole purposes of instituting litigation. Regardless of where the information was gained, if the Plaintiffs can support their 1999 "discovery" assertion, the litigation would have been commenced within the statute of limitations, and the claims would not be barred.

While the above decision resolves the statute of limitation issue raised in Ford's motion to dismiss as to the negligence claim, the Court maintains that the Plaintiffs' fraudulent concealment assertion, in the statute of limitations context, is without merit. The best the Plaintiffs can establish, is not a concealment by Ford, but simply a decision by it, that the vehicles located beyond the re-call area were not exposed to the dangers of environmental elements that may cause the activation of the defect. While this decision may have been unwise, or even incorrect, it does not equate to a fraudulent concealment by Ford. [16] Therefore, if the above decision, as to the time of discovery rule, is subsequently found to be incorrect by an appellate [*12] court or the Plaintiff fails to establish the defect was discovered in 1999, the negligence claim should be dismissed as time barred.

> 16    "Fraudulent concealment requires the twin showing of (a) the defendant's knowledge of the alleged wrong, and (b) an affirmative act of concealment by the defendant" and "mere silence or failure to disclose does not constitute such fraudulent concealment as will suspend operation of a statute of limitations." S&R Associates v. Shell Oil Co., 725 A.2d 431, 436 (Del. Super.1998).

## B. Breach of Warranty Claims

The Plaintiffs' breach of warranty claims fall squarely under Delaware's version of the Uniform Com-

2002 Del. Super. LEXIS 132, *

mercial Code governing the sale of goods. [17] The applicable statute of limitations, 6 *Del. C.* § 2-725, provides that causes of action based upon a breach of "any contract for sale must be commenced within 4 years after the cause of action has accrued." [18] According to subsection (2) of the statute, "a cause of action accrues [*13] when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." [19] The statute further states that "[a] breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered." [20] This Court has previously held that "unlike the judicial gloss applicable to other statutes in tort law, the clock by express statutory provision ticks in warranty actions when the breach occurs even though the buyer does not know the goods are defective." [21] Thus, the "time of discovery rule," has not been extended to breach of warranty actions. [22]

17  6 *Del. C.* § 2-725.

18  6 *Del. C.* § 2-725; *See also S&R Associates.*

19  6 *Del. C.* § 2-725(2).

20  6 *Del. C.* § 2-725(2).

21  *S & R Associates, L.P.,* 725 A.2d at 435 (citing *Lecates v. Hertrich Pontiac Buick Co.,* 515 A.2d 163, 175 (Del. Super. 1986).

[*14]
22  *S & R Associates, L.P.,* 725 A.2d at 435 (citing *Elmer v. Tenneco Resins, Inc.,* 698 F. Supp. 535, 539 (D.Del. 1988).

In this instance, tender of delivery occurred when the Plaintiffs purchased their Ford Escorts and Ford Mercury Tracers. Since the automobiles were "tendered" when purchased, this is when statute of limitations began to run as to any breach of warranty claims. Whether the time was 1991, 1992, 1993, or 1994, the Plaintiffs had four years within which, to bring a claim for breach of implied warranty of merchantability, breach of express warranty, or a breach of implied warranty of fitness for a particular purpose. Since the Plaintiffs did not bring their breach of warranty actions within the four year time limitation, the Plaintiffs' claims are barred as a matter of law. The recent case of *S&R Associates, L.P. v. Shell Oil Co.* aptly noted that

to extend a contract warranty beyond the four-year statute of limitations, there must be evidence of an express warranty extending to, or beginning after, a specific

future point in time beyond [*15] the four-year window. (citations omitted). An implied warranty, by its very nature, cannot extend to future performance because it makes no explicit warranty that speaks to a specific point in the future falls within this future performance exception. [23]

23  *Id.* 725 A.2d at 436.

In this case, the Plaintiffs contend that this "future performance" exception applies to their situation, but they fail to realize that the Court has previously held that "almost without exception the future performance exception of 2-725(2) has been construed narrowly" [24] and "the [fact that the] plaintiffs' lack knowledge of the defect is irrelevant." [25] Nowhere in the Plaintiffs Amended Complaint is there factual support for the allegation that Ford specifically extended any warranty to future performance. As noted in *S&R Associates,* "to extend a contract warranty beyond the four-year statute of limitations, there must be evidence of an express warranty extending to, or beginning after, a specific future point in time beyond [*16] the four-year window." [26] Upon a review of the record before the Court, it appears that Ford did not agree to extend the warranty past the usual time period, and thus, the Plaintiffs' claim that their vehicle's warranty was extended to "future performance" is inaccurate, and erroneous.

24  *Sellon v. Gen. Motors Corp.,* 571 F. Supp. 1094, 1098 (1983).

25  *Id.* at 1099.

26  *S & R Associates,* 725 A.2d at 436.

As such, the Court finds that Count II of the complaint is dismissed as barred by the statute of limitations.

## C. Magnuson-Moss Warranty Claims

The Magnuson-Moss Act created a statutory cause of action to allow consumers to sue in state or federal court for alleged warranty and consumer protection claims. In essence, the Act was initiated to provide a basic level of standards to insure honesty and reliability in transactions between consumers, suppliers, and manufacturers. A consumer, who prevailed under the Act, could elect to have the product [*17] replaced or request a refund, if the product could not be repaired after reasonable efforts. The Act could be characterized as similar to lemon laws passed by numerous states in the late 21st

century as demands for greater consumer protection became a public policy priority.

However, a separate and independent statute of limitations was not created under the Magnuson-Moss Act. As such, the Court must look to this state's statute of limitations for similar causes of action. [27] In Count V, the Plaintiffs have in essence, attempted to restate their breach of warranty claims set forth in Count II. The Plaintiffs assert in five of their six Magnuson-Moss Act violations that an implied warranty was breached. As such, the Court finds, in line with the holdings of other courts, [28] that the Magnuson-Moss Act is analogous to the Uniform Commercial Code adopted by Delaware, in Title 6 of the Delaware Code. Title 6 *Del. C.* § 2-725 provides for a four year statute of limitation, and for the reasons set forth in subsection I(B) above, Count V's Magnuson-Moss claims are also barred as a matter of law, as they were untimely filed. As such, the motion to dismiss Count [*18] V is granted.

> 27    *Cosman v. Ford Motor Company, 674 N.E.2d 61 (Ill. 1996); Lowe v. Volkswagen of America, Inc., 879 F. Supp. 28 (E.D. Pa. 1995).*

> 28    *Id.*

As a result of the above decision, there remains before the Court the appropriateness of the remaining counts based on other alleged legal deficiencies. The Court will now address those to the extent necessary to resolve the pending motion to dismiss.

## II. *Damages*

To successfully bring a negligence cause of action, one of a plaintiff's minimum obligations, is to establish that they have been harmed in some manner by a defendant's negligent conduct. In other words, there must be some reasonable assertion of damages to sustain a plaintiff's claim. In the instant case, the requirement of damages presents a difficult challenge to the Plaintiffs. First, at the commencement of this litigation, the Plaintiffs' vehicles had been operating without any indication of a defect, and there have not been any out of pocket [*19] repair costs incurred, or any inconvenience to the Plaintiffs caused by Ford's 's alleged conduct. Second, since the Plaintiffs' vehicles continue to properly operate, the Plaintiffs have not suffered any personal injuries, nor have they endured any property damage to their vehicles. Without the benefit of traditional damages, the Plaintiffs were forced to turn to the imaginative and creative abilities of their counsel to create an alleged "diminution of value" of their vehicles, should they ever attempt to re-sell them in the future. At the time this complaint was filed, none of the Plaintiffs had sold their vehicles, and thus they were not certain their perception of damages

were true, or whether their notion of damage was a fanciful speculation. To place this issue in a legal context, the Court must decide whether the Plaintiffs, who have not sustained any personal injuries, and have not suffered any out of pocket expenses, can recover "damages" to fix an alleged defective product, which has never manifested. The Court finds the answer to this inquiry must be "no."

In resolving this issue, the Court is persuaded by the reasoning and authority found in *Briehl, et al. v. General* [*20] *Motors Corporation, et al.* [29] In *Briehl*, the plaintiffs asserted similar breach of express and implied warranty, fraudulent concealment, and consumer protection claims, which related to the performance of their cars, trucks, and sport utility vehicle's ABS braking system. The *Briehl* plaintiffs maintained that their ABS breaking systems were defective because the breaks "performed in a manner completely counter-intuitive to how an average driver is conditioned to respond when a hard braking maneuver is attempted." [30] The plaintiffs' breaking systems however, had performed without failure, and the Eighth Circuit in turn found that the plaintiffs had not suffered any damages. In addressing the alleged loss of resale value argument, the *Briehl* court found

> While the Plaintiffs affirmatively state that they do not seek damages as a result of actual injury or property damage, they do allege that they have suffered economic harm in the form of lost resale value. The Plaintiffs insist that they have suffered damage because the ABS systems installed in their vehicles have diminished the vehicles' resale value. However, the Plaintiffs do not allege in the Original Complaint [*21] that any member of the purported class has actually sold a vehicle at a reduced value. The Plaintiffs also fail to state the amount of their damages. Apparently, the Plaintiffs seek to set their damages as the difference between a vehicle with the ABS system that they expected and the system that is actually installed in each of their vehicles. [31]

> The Plaintiffs' conclusory assertions that they, as a class, have experienced damages (and the method the Plaintiffs use to calculate the damages) are simply too speculative to allow this case to go forward. The Plaintiffs' assertion that their ABS-equipped vehicles are defective and that they have suffered a loss in resale value as a result of the defect is insuffi-

cient as a matter of law to plead a claim under any theory the Plaintiffs have advanced. Even construing all allegations in favor of the Plaintiffs, we find that the District Court was correct when it dismissed the Plaintiffs' Original Complaint for failure to state a claim. [32]

Similar to the *Briehl* situation, the damages in this case are speculative, and to allow the case to go forward would be unjust. The judicial system has been established to allow an aggrieved [*22] party a forum to recover for damages allegedly suffered by the actions of a defendant. [33] However, the judicial system is not required to entertain actions where plaintiffs have not suffered any damages. [34] The Plaintiffs in the case at bar have not presented any damages because none have been sustained. As a result, Count I of the Complaint is hereby dismissed.

29  *Briehl v. General Motors Corp., 172 F.3d 623 (8th Cir. 1999).*

30  *172 F.3d at 626.*

31  *Id. at 628-629.*

32  *Id.*

33  *See Briehl at 628 (quoting Feinstein v. Firestone Tire & Rubber Co., 535 F. Supp. 595, 603 (S.D.N.Y. 1982)* for the proposition that "liability does not exist in a vacuum; there must be a showing of some damage.").

34  *See e.g. Pfizer v. Farsian, 682 So.2d 405, 407 (Ala. 1996)*(holding that a plaintiff's belief that a product may possibly fail in the future is not a legal injury sufficient to support a plaintiff's claim.).

[*23]  For the same reasons as set forth above, Count IV's fraud allegations must also be dismissed. Delaware courts have consistently held that to successfully plead a fraud claim, the allegedly defrauded plaintiff must have sustained damages as a result of a defendant's actions. [35] Since the Plaintiffs here have not suffered any damages, Count IV unavoidably fails. In essence, Count IV's allegations are simply a general assertion that because some Ford vehicles were re-called and fixed, while others were not, those that were not re-called and fixed must have invariably sustained some damage. This assertion is at best, speculative, but more importantly, it is not based on identifiable facts. The Plaintiffs' vehicles have not sustained any damages. The vehicles

have continued to properly operate, and Count IV is merely an attempt to create a claim where one does not exist. As a result, Count IV is dismissed.

35  *Sterling v. Beneficial Nat. Bank N.A., 1994 Del. Super. LEXIS 252, 1994 WL 315365, at *3 (Del. Super. 1994); Browne v. Robb, 583 A.2d 949 (Del. 1990).*

[*24]  III. *Unjust Enrichment*

Count III is the lone surviving count, which asserts "unjust enrichment" by Ford in its retention of money that should have been used to repair the Plaintiffs' vehicles. [36] While plead separately, the Plaintiffs' answering brief contends that this count "is merely a measure of the damages for the breach of contract and/or fraud and concealment." This statement by the Plaintiffs is an admission that their dispute with Ford is a contractual one. Because the Plaintiffs, in essence, have conceded this is a breach of contract claim, the remedy they seek, "restitution" or "unjust enrichment" is unavailable to them. [37] Since the unjust enrichment claims underlying assertions have been dismissed, this claim is without merit and fails as well.

36  "Unjust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *ID Biomedical Corp. v. TM Technologies, Inc., 1995 Del. Ch. LEXIS 34, C.A. No. 13269, 1995 WL 130743, at *15 (Del. Ch. Mar. 16, 1995) (quoting Fleer Corp. v. Topps Chewing Gum, Inc., 539 A.2d 1060, 1062 (Del. 1988)).*

[*25]

37  *See ID Biomedical Corp. 1995 Del. C.h. LEXIS 34, 1995 WL 130743, at *15* (noting that "courts developed unjust enrichment, or quasi-contract, as a theory of recovery to remedy the absence of a formal contract," and that "[a] party cannot seek recovery under an unjust enrichment theory if a contract is the measure of the plaintiff's right.").

Again, the Plaintiffs have failed to sufficiently allege that their vehicles have been damaged, or that their Ford vehicles have exhibited the wiring defect. It is difficult to understand why Ford should be required to repair a vehicle that is, in essence, not damaged. To the extent the Plaintiffs rely upon an "unjust enrichment" theory to support their damage claim, the Court finds these speculative allegations are unsupported in the facts as alleged by the Plaintiffs in their amended complaint.

*CONCLUSION*

2002 Del. Super. LEXIS 132, *

For the reasons set forth above, Ford's motion to dismiss is hereby granted as to all counts. [38]

38 The Court has not considered the other basis for dismissal asserted by Ford because of the above decisions. The failure to specifically address those claims is not reflective of the Court's opinion concerning the appropriateness of said arguments. It is simply a recognition that they have been mooted by this Court's decision.

[*26] IT IS SO ORDERED.

Judge William C. Carpenter, Jr.

LEXSEE 1996 U.S. DIST. LEXIS 10949

JOSEPH A. HANSEN, Plaintiff, v. UMTECH INDUSTRIESERVICE UND SPEDITION, GmbH, a foreign corporation, Defendant.

Civil Action No. 95-516 MMS

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

*1996 U.S. Dist. LEXIS 10949*

July 3, 1996, Decided

**NOTICE:**    [*1]  NOT FOR PUBLICATION

**DISPOSITION:**    Umtech's motion to disqualify Hansen's expert Castro denied. Umtech's motion for summary judgment on the negligence claim denied. Umtech's motion for summary judgment on the strict liability claim granted. Umtech's motion for summary judgment on the breach of implied warranty of merchantability claim denied.

**COUNSEL:** Jan R. Jurden, Esq., and Matthew P. Denn, Esq., of Young, Conaway, Stargatt & Taylor, Wilmington, Delaware; and Vincent A. Bifferato, Jr., Esq., of Herrmann & Bifferato, Wilmington, Delaware; attorneys for plaintiff.

John S. Spadaro, Esq., and Patricia A. Garthwaite, Esq., of Murphy, Welch & Spadaro, Wilmington, Delaware; attorneys for defendant.

**JUDGES:** Murray M. Schwartz, Senior District Judge

**OPINION BY:** Murray M. Schwartz

**OPINION**

**MEMORANDUM OPINION**

Dated: July 3, 1996

Wilmington, Delaware

**Murray M. Schwartz, Senior District Judge**

**I. Introduction**

The motions presently before the Court arise out of a personal injury action brought by plaintiff Joseph A. Hansen ("Hansen") against defendant Umtech Industrieservice Und Spedition, GmbH ("Umtech"). Hansen al-leges personal injuries to his arm and hand, suffered while attempting to free [*2]  his pant leg from a machine allegedly sold and installed by Umtech. Hansen sued under various theories of negligence, strict liability, and breach of implied warranty. Jurisdiction is based on diversity of citizenship, *28 U.S.C. § 1332.*

**II. Factual Background**

The facts underlying the complaint giving rise to these motions are relatively simple. Hansen, a Maryland citizen, was employed by K-F Environmental Technologies, Inc. ("K-F"), and at all times relevant to this action, was assigned to work at the Kent County Waste Water Treatment Plant. [1] Docket Item ("D.I.") 6 ("Complaint") at PP 1, 4. [2] Umtech is a German corporation with its principal place of business in Edenkoben, Germany. *Id.* P 2. On October 1, 1993, Hansen was working with a waste treatment dryer allegedly sold and installed by Umtech ("Dryer 2"). *Id.* PP 5, 6. While Hansen was working, the leg of his pants became caught in an exposed moving drive chain and sprocket assembly. In the attempt to free his pant leg from the assembly, his left hand became caught in the assembly. *Id.* P 7. As a result, Hansen suffered the loss of three fingers, a fracture of his left arm, and pain and suffering. *Id.* P [*3]  8.

1    K-F is not a party to this litigation.

2    All references to the complaint are made to plaintiff's Second Amended Complaint, D.I. 6, filed September 27, 1995.

Hansen filed this action against Umtech alleging li-ability arising out of the sale and installation of the dryer which caused Hansen's injury. The litigation has gener-ated several motions. Hansen has moved to compel cer-tain discovery from Umtech. D.I. 41. Umtech has moved to disqualify Hansen's vocational rehabilitation expert, D.I. 44, and has also moved to disqualify Hansen's medi-

1996 U.S. Dist. LEXIS 10949, *

cal experts and an economist. D.I. 60. Umtech has also moved for summary judgment on Hansen's negligence claim, D.I. 72, as well as on his claims for strict liability and for breach of implied warranty of merchantability. ~~D.I. 70.~~

Oral argument was held on June 19, 1996. The Court denied in part Hansen's motion to compel, D.I. 41, ~~and the remaining grounds for the motion, through the~~ course of the argument, became moot. The Court also denied Umtech's motion to disqualify [*4] Hansen's medical experts and his economist, D.I. 60. The motions remaining for consideration are (1) Umtech's motion to disqualify Hansen's vocational rehabilitation expert, D.I. 44; (2) Umtech's motion for summary judgment on the negligence claim, D.I. 72; and (3) Umtech's motion for summary judgment on the strict liability and breach of implied warranty of merchantability claims, D.I. 70. Each motion will be addressed separately.

## A. Umtech's Motion to Disqualify Plaintiff's Expert Castro

Umtech has moved to disqualify plaintiff's vocational rehabilitation expert Jose Castro ("Castro") from testifying as an expert witness, and from offering expert services or other assistance in the prosecution of this case. D.I. 44. Umtech further moved to disqualify Castro's employer, the Delaware Valley Rehabilitation Services, Inc. ("DVRS"), from participating in this case, *id.*, and moved to prevent plaintiff from relying on or otherwise making use of any work product or advice prepared or offered by DVRS.

On December 4, 1995, Umtech's counsel Patricia Garthwaite ("Garthwaite") contacted Thomas L. Yohe ("Yohe"), a vocational rehabilitation expert employed by DVRS. D.I. 45 at 3. During [*5] the initial conversation with Yohe, Garthwaite inquired whether DVRS had any conflict of interest which might preclude it from consulting on the case. Yohe telephoned Garthwaite back promptly and responded that no conflict existed. *Id.* at 4. During this second telephone conversation, Garthwaite discussed certain substantive matters relating to the case with Yohe. According to a certification in the record, Garthwaite's discussion with Yohe included the following topics:

> At a minimum, we discussed the date of the plaintiff's accident; my knowledge (as of December 4) of the function and operation of the sludge dryer unit at issue in this case; my analysis (as of the same date) of how the accident might have occurred; specific facts relating to the plaintiff's job duties and salary that I regarded as potentially relevant to the issue of vo-

cational rehabilitation; and the relative strengths and weaknesses of our defense posture on those issues, in light of the plaintiff's age, level of training and marketable skills.

*Id.*, Exhibit ("Exh.") A, P 5. The following day, ~~Garthwaite sent a confirmation letter confirming the re-~~ tention of Yohe as an expert, and included [*6] a sentence requesting confidentiality. *Id.* at Exh. B. That same day, Yohe sent by facsimile a document entitled "Typical Records Needed in Personal Injury Cases" to Garthwaite. *Id.* at Exh. C. However, neither Yohe nor Garthwaite took any further action with respect to this facsimile in particular, or to the case in general.

Meanwhile, in February, 1996, Hansen retained the same firm of DVRS to consult for its case, specifically retaining expert Castro. Before the retainer was finalized, Hansen inquired as to whether any conflicts of interest existed which might affect or prohibit Castro from working on the case. Castro ran a conflicts check in the DVRS computer system which tracks conflicts of interest. However, Yohe's representation of Hansen's adversary did not surface, because Yohe had failed to enter the information regarding his representation of Umtech into the computer system, and because Yohe himself was on vacation at the time. Thus, Castro told Hansen that there was no conflict, and agreed to the representation.

In furtherance of the representation, Castro began to work on Hansen's case. On February 29, 1996, Castro, on behalf of DVRS, issued a 13-page, single-spaced [*7] report which analyzed topics including Hansen's medical status, social/educational factors, vocational history, transferable skills, career assessment, and wage earning capacity. D.I. 50 at B14-26. On March 7, 1996, Hansen's counsel sent a check in the amount of $ 1,440.02 to DVRS for its services. *Id.* at B27.

Umtech contends that Castro should be disqualified because Umtech's counsel, Garthwaite, retained DVRS in a confidential relationship and confidential information passed between them. D.I. 45. Umtech also urges that the disclosure of confidential information on the part of Castro should be irrebuttably presumed, and that policy considerations such as avoiding the appearance of impropriety support disqualification. Finally, Umtech argues that the interest in preventing jury confusion in the likely event that Umtech would cross-examine Castro on his affiliation with the same firm as Umtech's prior expert supports disqualification.

Hansen responds by arguing that Castro should not be disqualified because Castro has not and will not discuss the case with Yohe. D.I. 49. Hansen argues that

1996 U.S. Dist. LEXIS 10949, *

Umtech did not have a confidential relationship with Yohe and did not disclose confidential [*8] information. Further, Hansen argues that Umtech would not be prejudiced by Hansen's use of DVRS as expert consultants. Finally, Hansen disputes Umtech's analogy to attorney conflicts cases, where courts are more apt to disqualify attorneys with conflicting loyalties.

Central to resolution of this issue is what standard applies to the disqualification issue. After briefing was complete, the parties now agree that the standard for conflicts disqualification for attorneys is more stringent than that of experts. Compare, D.I. 49 at 14, and D.I. 51 at 14-15 (Umtech arguing that "irrespective of the "attorney rules" debate, disclosure of confidential information by DVRS to Hansen should be irrebuttably presumed). This proposition is amply supported by case law. See, e.g., EEOC v. Locals 14 and 15, Int'l Union of Operating Engineers, 24 Fair Empl. Prac. Cas. (BNA) 1821; 25 Empl. Prac. Dec. (CCH) P 31,783 at 6 (S.D.N.Y. Feb. 11, 1981) (rejecting analogy to attorney-client disqualification); Paul v. Rawlings Sporting Goods Co., 123 F.R.D. 271, 281 (S.D. Ohio 1988) (same); English Feedlot, Inc. v. Norden Labs., Inc., 833 F. Supp. 1498, 1501 (D. Colo. 1993) (same); Cordy v. [*9] Sherwin-Williams Co., 156 F.R.D. 575, 580 (D.N.J. 1994) (same).

There are two scenarios in which motions to disqualify experts typically arise. The first is where one expert is originally retained by one party to litigation, and that expert subsequently switches sides to consult as an expert for that party's adversary. These cases are referred to as "side-switching" cases, and form the most common basis for motions to disqualify. A second scenario, such as in the case sub judice, occurs where an expert is retained by a party to litigation, and then the adversary retains an expert who is in some way affiliated with the expert retained by the first party. In both cases, a conflict of interest may arise which may preclude one or both parties from using its retained expert, depending on the nature and extent of the relationship and the exchange of confidential information between each party and its expert.

While there is relatively sparse case law on expert disqualification concerning either factual scenario, analysis must begin with the recognition of the inherent power of federal courts to disqualify experts. English Feedlot, 833 F. Supp. at 1501; Cordy, 156 F.R.D. at [*10] 579-80; Wang Labs., Inc. v. Toshiba Corp., 762 F. Supp. 1246, 1248 (E.D. Va. 1991). This power exists to further the judicial duty to protect the integrity of the adversary process and to promote public confidence in the fairness and integrity of the legal process. Wang, 762 F. Supp. at 1248; Paul, 123 F.R.D. at 278.

Courts have fashioned a two-part inquiry used to determine whether disqualification is necessary:

> First, was it objectively reasonable for the first party who claims to have retained the consultant to conclude that a confidential relationship existed?

> Second, was any confidential or privileged information disclosed by the first party to the consultant?

Paul, 123 F.R.D. at 278; Wang, 762 F. Supp. at 1248. In Paul, the plaintiff had suffered extensive head injuries from being struck by a baseball while wearing a helmet manufactured by defendant sporting goods company. Plaintiff retained an expert in mechanical engineering to consult in connection with his personal injury action against defendant. However, defendant had previously used the same expert for the purpose of engaging in extensive testing of its helmets, but the court [*11] found that the consultation was not specifically for the purpose of the lawsuit. Applying the two-part test, the court found that although defendant's counsel reasonably believed that a confidential relationship had been established with the expert, no confidential or privileged information passed from defendant to the expert. Id. at 280. Thus, disqualification was not warranted.

The result reached in Paul is appropriately characterized by a situation where "despite the existence of a formal contractual relationship, so little of substance occurs during the course of the relationship that neither the integrity of the trial process, nor the interests of the party who retained the expert, would be served by blanket disqualification." Paul, 123 F.R.D. at 278. In connection with the two-part test set forth in Paul, a negative answer to either prong should result in a finding of no disqualification. Wang, 762 F. Supp. at 1248 ("But disqualification is likely inappropriate if either inquiry yields a negative result."). As the Wang court explained, in interpreting Paul, even if a confidential relationship exists, disqualification is inappropriate unless some privileged [*12] or confidential information passed; if this were not the rule, then a lawyer could potentially disqualify an expert merely by retaining him with no intention of actually using the expert's services, to disable his opponent from using the expert for himself. Id. at 1248.

The Paul two-part inquiry has been repeatedly cited and utilized by courts ruling on motions to disqualify experts who have engaged in side-switching. In Wang, 762 F. Supp. 1246, the court disqualified an expert who had consulted with plaintiff on the issue of the validity of

plaintiff's patent, communicated to plaintiff's counsel that in his opinion the patent was invalid, and then was subsequently retained by defendant for the same litigation. The court found a confidential relationship existed because the plaintiff's attorney gave the expert a detailed memorandum used by the expert containing, *inter alia*, the patent file history and potential defenses to the lawsuit, both of which the court found to be protected confidential work-product. *Id. at 1249.* Similarly, in *Cordy*, *156 F.R.D. 575*, the court disqualified defendant's expert who had previously consulted with plaintiff's counsel in a personal [*13] injury action, and then changed sides to consult for the defendant. Plaintiff had made telephone calls to the expert, executed a retainer agreement, forwarded a retainer check, sent a three-ring binder of documents to the expert relating to the investigation of the injury, and had been billed for 27 hours of work in the amount of $ 2,094.23. Further, the expert had issued an oral report for plaintiff, all before the expert switched sides. *Id. at 577.*

However, in *Mayer v. Dell, 139 F.R.D. 1 (D.D.C. 1991)*, the court reached an opposite conclusion. That court declined to disqualify defendant's expert on plaintiff's motion, finding that plaintiff, who had purported to retain the same expert before defendant, had never actually retained the expert, had only met with the expert on one occasion, had only given the expert one document, which was the complaint, had not received the benefit of any of the expert's work, had never asked the expert to sign a confidentiality agreement, and had paid no fee to the expert. *Id. at 2.* In *English Feedlot, 833 F. Supp. 1498*, the court also denied a motion to disqualify plaintiff's expert who had previously consulted for defendant in prior [*14] litigation, because defendant had not disclosed confidential information to the expert. *Id. at 1501.*

These cases illustrate the types of factors considered by courts ruling on motions to disqualify. All of these cases, however, involved side-switching experts. There are even fewer cases dealing with conflicts caused by experts who are affiliated with experts consulting for the other side. *EEOC, 25 Empl. Prac. Dec. (CCH) P 31,783*, addressed this situation. There, counsel for defendant contacted an expert for the purposes of consulting on Title VII litigation. Consultations were limited to two days, and included discussions about the relevant labor market, defense theories, and the strengths and weaknesses of the defense and the EEOC's positions. *Id. at 3.* Less than one year later, that expert founded a new consulting firm whose shares were owned in part by another expert who was subsequently retained by the EEOC for the same litigation. *Id. at 4.* The court found that because there was no evidence that any substantive information was exchanged among the expert-partners, nor was there

evidence of danger of future inadvertent disclosure, disqualification was not warranted. [*15] *Id. at 7.* Indeed, the court found that because the experts had limited contact, separate offices, no mutual access to computer accounts in which they store data, separate file areas, and a strong ethic of maintaining client confidentiality, the danger of leakage of information was "minimal." *Id.*

The other case dealing with affiliated experts disqualification motion is *Great Lakes Dredge & Dock Co. v. Harnischfeger Corp., 734 F. Supp. 334 (N.D. Ill. 1990)*. There, plaintiff retained a consulting firm to determine the cause of failure of its ship's bearings. The consulting firm employed an expert in metallurgy to consult, with the intention to use his testimony at trial against the defendant who sold the ship to plaintiff. *Id. at 335.* Defendant filed a third-party complaint against the bearing manufacturer. The third-party defendant then retained its own expert. *Id.* Plaintiff moved to disqualify the third-party defendant's expert on the ground that he worked at the same consulting firm at which its own expert occasionally worked and, in fact, frequently supervised plaintiff's expert's work. *Id.*

The court reviewed the *Paul* line of cases, noting that the facts [*16] of those cases were unlike those before it: "the other cases involved the 'switching sides' expert who at one time or another did work for a party's adversary." *Id. at 338.* The only case with similar facts the *Great Lakes* court cited was *EEOC, supra.* Concluding that disqualification would be denied, the court noted the following relevant factors: neither party alleged it had disclosed confidential or privileged information to the opposing side's expert; plaintiff's expert had not discussed the case with the firm which employs defendant's expert; defendant's expert denied knowledge of plaintiff's expert's work; "no communication or 'leakage' whatsoever of any information, whether confidential, privileged, or otherwise" had occurred; and both parties were aware of the situation and could take steps to prevent inadvertent disclosure. *Id. at 338-39.* Thus, while not expressly applying the *Paul* test for side-switching experts, the court considered the same confidentiality concerns.

A party seeking to disqualify another party's expert bears the burden of demonstrating the existence of a confidential relationship and the passing of confidential information. *Cordy,* [*17] *156 F.R.D. at 580; English Feedlot, 833 F. Supp. at 1501-02.* In this case, Umtech bears the burden of demonstrating that Umtech and Yohe had a confidential relationship and that confidential or privileged information passed between them, such that plaintiff should be prohibited from using his expert from the same firm.

1. Confidential Relationship Between Umtech and Yohe

1996 U.S. Dist. LEXIS 10949, *

Umtech argues that a confidential relationship existed between Umtech and Yohe. It argues that DVRS was retained in December, 1995, with the intent to use Yohe as a consulting, and possibly a testimonial, expert. According to Garthwaite's certification, she spoke with Yohe twice on the telephone to discuss the possibility of retaining him. D.I. 45 at Exh. A. Yohe was formally retained during the second conversation, which was confirmed by written letter (mistakenly) dated December 4, 1995. Also during that second conversation, Garthwaite discussed aspects of the case including the date of the plaintiff's accident, her knowledge (as of December 4) of the function and operation of the sludge dryer unit at issue in this case, her analysis (as of the same date) of how the accident might have occurred, specific [*18] facts relating to the plaintiff's job duties and salary that she regarded as potentially relevant to the issue of vocational rehabilitation, and the relative strengths and weaknesses of Umtech's defense posture on those issues, in light of the plaintiff's age, level of training and marketable skills. *Id. P 5.* Garthwaite further states that she asked about the records Yohe would need to conduct his analysis, and the next day, she received a facsimile of a document entitled "Typical Records Needed in Personal Injury Cases." *Id. PP 5, 6.*

*Paul* requires a court to determine whether counsel reasonably believes a confidential relationship has been established with the expert. *Paul, 123 F.R.D. at 278.* In this case, Garthwaite might reasonably have believed a confidential relationship was created between herself and Yohe, given the fact that she sent a confirmation letter regarding the retention of Yohe, which contained a reminder of the need for confidentiality. Whether that belief was reasonable need not be determined. It will be assumed that a confidential relationship between attorney an expert did exist.

2. Exchange of Confidential Information

Despite the existence [*19] of a confidential relationship, the amount of confidential information which passed to the expert is questionable. Garthwaite certifies that she has had no further personal contact with Yohe since December 5, 1995, and that she never forwarded any documentation to Yohe so that he might begin his analysis. The record does not indicate that Umtech or Garthwaite's law firm ever paid any money to Yohe or DVRS. Yohe, in a letter dated March 8, 1996, states that he "did not open a file [in December] as [he] was anticipating receiving materials in the near future." D.I. 45 at Exh. D. He explained that he typically opens a case upon receipt of the materials needed, *id.*, and it has been his experience that occasionally following initial attorney contact, he never hears about the case again. He further admitted that he "frankly, forgot about the matter until

[his] phone call with [defense counsel]" on March 8, 1996. *Id.* He stated he "never had reason to speak about this case" with Castro until the conflict surfaced, *id.*, and that he does not, at any rate, work closely with Castro or participate in any details of Castro's work.

While counsel stated that she discussed her [*20] analysis of the case, including its strengths and weaknesses, with Yohe, Yohe has no recollection of the details of that conversation. D.I. 45 at Exh. D. Additionally, Garthwaite's disclosures in connection with the liability phase of the case are not germane to either Yohe's expertise or expert opinion. Further, Yohe forgot about the case entirely until the conflict was made known to him by Castro and Umtech's counsel. *Id.* It is clear, then, that to the extent that counsel disclosed confidential information, Yohe did not in any way use that information. Furthermore, and more importantly, Yohe never discussed the case with anyone, including Castro. Suffice it to say that if the expert himself can't remember any of the information, he certainly could not have passed it along to the other expert. Like *Paul*, this is a case where "despite the existence of a formal contractual relationship, so little of substance occurs during the course of the relationship that neither the integrity of the trial process, nor the interests of the party who retained the expert, would be served by blanket disqualification." *Paul, 123 F.R.D. at 278.*

The most important consideration in expert disqualification [*21] cases, as noted above, is the preservation of confidentiality. The *Paul* inquiry relates to sideswitching experts, and its rationale of confidentiality, rather than the two-part inquiry, guides this Court, as it is faced with a dissimilar factual context. Like the *EEOC* and *Great Lakes* courts, the absence of evidence that any substantive information was exchanged among the affiliated experts, and their being no prospect of future inadvertent disclosure, leads the Court to conclude that disqualification is not warranted. Like those cases, Yohe and Castro maintain separate practices and have limited contact beyond "pleasant conversation." D.I. 45 at Exh. D. Neither has a supervisory relationship over the other. *Id.* Accordingly, Umtech's motion to disqualify Castro will be denied. Similarly, Umtech's request to disqualify DVRS from participating in the case, and to prevent Hansen from relying on any work product or advice from DVRS, will be denied.

B. Umtech's Motion for Summary Judgment: Negligence

Before examining the arguments in this motion, it is important to identify the theory under which Hansen asserts liability by Umtech. His complaint refers to Umtech's [*22] duty as *manufacturer* of Dryer 2. D.I. 5, PP 9-16. However, plaintiff appears to have abandoned his

1996 U.S. Dist. LEXIS 10949, *

manufacturer theory and relies exclusively on theories of duty as seller to warn, and a duty as the installer to make the equipment safe.

Umtech moves for summary judgment on several grounds. First, Umtech argues that plaintiff's contributory negligence is the dominant, if not the sole, proximate cause of his injury, in that Hansen (1) was aware of the danger of exposure to the chain drive yet chose to clean the dryer without first shutting it off, and then (2) failed to shut off the machine once his pant leg was caught; (3) twice failed to look before attempting to free his pant leg; and (4) failed to immediately call for help. D.I. 73. Umtech further argues that it bears no liability for K-F's negligent operation of Dryer 2, that K-F was a sophisticated purchaser and was provided a safety manual with warnings, and that Umtech had no reason to know of a defect in Dryer 2. Umtech's reply brief more succinctly (if not differently) states its defense in legal terms: Umtech owed Hansen no duty; K-F's negligence is a superseding cause of Hansen's injuries; Hansen's own negligence is [*23] a superseding cause of his injuries; and at a minimum, Hansen's own negligence is the main proximate cause of his injuries. D.I. 86.

### 1. Negligence Standard

In order to recover in an action for negligence, a plaintiff must show by a preponderance of the evidence that the defendant's negligent act or omission violated a duty which was owed to the plaintiff. *Culver v. Bennett, 588 A.2d 1094, 1096-97 (Del. 1991).* [3] Plaintiff must also show that the defendant's act of negligence was the proximate cause of plaintiff's injury. *Id. at 1097.* With respect to proximate cause, Delaware adheres to the "but for" rule: "a defendant's conduct is the cause of an event if the event would not have occurred but for that conduct; conversely, the defendant's conduct is not a cause of the event, if the event would have occurred without it." *Reese v. Home Budget Ctr., 619 A.2d 907, 910 (Del. 1992).* Delaware also recognizes there can be more than one proximate cause of an injury. *Id.; see also Culver, 588 A.2d at 1097.* The issue of proximate cause is ordinarily a question of fact to be submitted to the jury. *Id.; see also Duphily v. Delaware Elec. Coop., Inc., 662 A.2d 821, 830 (Del.* [*24] *1995).*

> 3 The parties have stipulated that Delaware law applies to this dispute. *See infra* Part C(1).

### 2. Contributory Negligence

In 1984, Delaware enacted a modified comparative negligence statute, *10 Del. C. § 8132,* which provides:

> In all actions brought to recover damages for negligence which results in death

or injury to person or property, the fact that the plaintiff may have been contributorily negligent shall not bar a recovery by the plaintiff or his legal representative where such negligence was not greater than the negligence of the defendant or the combined negligence of all defendants against whom recovery is sought, but any damages awarded shall be diminished in proportion to the amount of negligence attributed to the plaintiff.

This statute has been interpreted by the Supreme Court of Delaware as follows:

> If the plaintiff's contributory negligence is 50% or less, the plaintiff is permitted to recover, although the recovery is reduced proportionally. However, [*25] if the plaintiff's contributory negligence is 51% or greater, it is an absolute bar to recovery according to the Delaware statute.

*Culver, 588 A.2d at 1098.*

Umtech's central argument is that Hansen's contributory negligence was the main, if not the sole, cause of his injury, and therefore, his claim is barred. Umtech argues that the accident would never have occurred but for Hansen's negligence. It argues that Hansen was aware of the danger of exposure to the chain drive yet chose to clean the dryer without first shutting it off, and then neglected three safe alternative courses of conduct by failing to shut off the machine once his pant leg was caught, failing to look before attempting to free his pant leg, and failing to immediately call for help. Umtech argues that these acts amount to the dominant, if not the sole, proximate cause of his injuries. D.I. 73. In short, Umtech argues that Hansen chose the risky path by attempting to clean the dryer without first shutting it off, and then failed to use reasonable methods to shut it off once his pants were caught.

Umtech relies heavily on *Johnson v. Hockessin Tractor, Inc., 420 A.2d 154 (Del. 1980).* In that case, plaintiff [*26] was injured while attempting to shut off a tractor engine by reaching under the carburetor for a valve, without looking, and instead placed his fingers into an operating belt and pulley system. *Id. at 155.* The court found that plaintiff knew of the danger created by shutting off the risky path by attempting to shut off the tractor engine with that valve rather than with the "kill button," and his attempt to shut off the en-

gine with that valve in any event, without looking, constituted contributory negligence. Accordingly, the court affirmed the trial court's grant of summary judgment in favor of defendants:

> In addition, we note that plaintiff could have used an inherently safe method . . . to shut off the tractor engine. Instead he chose to use . . . a method which he knew was fraught with risk, particularly when done without looking. If a person has the choice of two alternate paths, one known to be safe, the other known to be risky, the unnecessary choice of the risky path constitutes contributory negligence.

> Accordingly, we find no error in the Trial Court's conclusion of contributory negligence as a matter of law.

*Id. at 158-59* (citations omitted).

Reliance on *Johnson* is unavailing to [*27] Umtech. *Johnson* was decided in 1982, two years before the Delaware Legislature enacted the modified comparative negligence statute, *10 Del. C. § 8132.* When *Johnson* was decided, the Supreme Court of Delaware was using the common law contributory negligence doctrine, which held that contributory negligence was an absolute bar to any recovery by a plaintiff in Delaware. *See Culver, 588 A.2d at 1097.* Thus, once the court found any negligence on the part of the plaintiff, summary judgment would necessarily be entered against him. Now, however, a finding of negligence on the part of the plaintiff does not necessarily yield the same result. Only upon a finding that the plaintiff was more than 50% negligent will summary judgment be granted against him. Stripped to its most basic element, Umtech is asking this Court to decide that the combination of Hansen's acts and omissions amounts to more than 50% of the negligence which led to his injury. This determination cannot be made as a matter of law, and therefore must be made by a jury. Summary judgment on the ground of contributory negligence will be denied. [4]

> 4 Umtech's reply brief argues that Hansen's negligence was also the superseding cause of his injuries, which would absolve Umtech from liability. Despite the fact that Umtech raises a new legal defense in its reply brief, this argument is without merit. Superseding causes refer to new and independent acts, *see Duphily, 662 A.2d at 829*, not to the plaintiff's own negligence. The proper defense arising out of plaintiff's own neg-

ligence is contributory negligence, as Umtech had originally argued.

[*28] 3. Effect of Alleged Negligent Operation of Facility by K-F

Umtech argues that it bears no liability for the negligent operation of Dryer 2 by Hansen's employer, K-F. Hansen stated in his deposition that K-F had increased production at the facility, which increased the frequency of clogging of the dryer. D.I. 74 at A-70-72. Increased production also rendered it infeasible, according to Hansen, to shut off the dryer when cleaning was needed. *Id.* at A-151-52. Further, Hansen alleges that the blower on the platform was broken, and this caused poor visibility on the platform, further adding to the danger. *Id.* at A-198. Umtech asserts these allegations are properly directed at K-F, not Umtech, and Umtech bears no responsibility for K-F's failures.

While not clearly stated in its opening brief, Umtech's reply brief argues that K-F's alleged acts of negligence are the superseding cause of Hansen's injuries. D.I. 86 at 15. A superseding cause is a new and independent act, itself a proximate cause, which breaks the causal connection between the original tortious conduct and the injury. *Duphily, 662 A.2d at 829.* If the intervening act of negligence was not reasonably foreseeable [*29] to the original tortfeasor, the intervening act supersedes and becomes the sole proximate cause of the plaintiff's injuries, relieving the original tortfeasor of liability. *Id.*

The Supreme Court of Delaware has held that the question of superseding cause is "fact-driven" and is a question for the jury. *Id.* The *Duphily* court explained:

> An intervening negligent act will not relieve the original tortfeasor from liability if: the original tortfeasor at the time of his negligence *should have realized* (foreseen) that another's negligence might cause harm; or, if a *reasonable person* would not consider the occurrence of the intervening act as *highly extraordinary;* or if the intervening act was not *extraordinarily negligent.* Considerations of foreseeability and what a reasonable person would regard as highly extraordinary are factual questions ordinarily reserved for the jury.

*Id. at 830-31* (emphasis in original); *see also Restatement (Second) of Torts § 453 cmt. b (1965)* ("[if] under the undisputed facts there is room for reasonable differ-

1996 U.S. Dist. LEXIS 10949, *

ence of opinion as to whether such act was negligent or foreseeable, the question should be left [*30] to the jury.").

As noted above, a superseding cause is a new and independent act, *itself a proximate cause*, which breaks the causal connection between the original tortious conduct and the injury. *Duphily, 662 A.2d at 829* (emphasis supplied). Umtech has failed to demonstrate how K-F's alleged acts of negligence are the proximate cause of Hansen's injuries. According to both parties, the acts of K-F were (1) the increased production at the facility, coupled with the changes in chemicals used, which caused an exponential increase in dryer clogging, and (2) the failure to repair the blower on the top of the platform, which caused poor visibility and obscured Hansen's vision. Neither of these acts, alone or in the aggregate, was the "but for" cause of Hansen's injuries. Poor visibility did not cause Hansen's pant leg to become caught: the exposed chain drive was the cause of his entanglement. Increased production did not cause his pant leg to become caught: if anything, it made the number of occasions on which Hansen was on the platform greater. However, even if Hansen's job required him to stand on the platform all day long, a protected chain drive would have still prevented [*31] his accident. Thus, the superseding cause argument cannot prevail as a matter of law at this stage of the proceeding, because there has been no demonstration of proximate cause on the part of K-F.

Even if Umtech had demonstrated how K-F's alleged negligence proximately caused Hansen's injuries, the superseding cause argument would have to be left to the jury. The Court will not make factual determinations on summary judgment as to whether it was foreseeable to Umtech, at the time of its alleged negligent installation of the dryer, that K-F would increase productivity and/or change the formula for the sludge cake, which Umtech asserts causes more clogging of the dryer, or whether it was foreseeable that a blower might break, and cause poor visibility on the platform. Summary judgment on the ground of superseding cause will be denied.

4. Sophisticated Purchaser Defense to Duty to Warn

Umtech also argues that it supplied K-F with a detailed operating manual for Dryer 2, which was more than 60 pages in length. Umtech argues that it was entitled to rely on K-F to warn its employees of the dangers or defects as set out in the manual. The manual was provided by Umtech to K-F, in German; [*32] K-F's president, Petra Freuhbis, translated it into English. The safety manual provided to K-F by Umtech contains the following warnings:

### 3.1 MAKE SURE ALL COVERS AND DOORS ARE LOCKED AND

SECURED TIGHTLY BEFORE START-UP!

### 3.2 KEEP ALL TROUGH COVERS AND DOORS AT CHAIN DRIVES CLOSED. Screws on covers and doors may only be opened during shut-downs. Ensure that it is not possible to accidentally start the equipment during cleaning and maintenance procedures (Lock Out Tag Out Systems!). Upon completion of cleaning and maintenance all covers and doors must be closed and secured.

### 3.3 SAFETY COVERS ON CHAIN DRIVES may not be removed during operation. Equipment must be shut off for repairs and secured against accidental start-up (see 3.2).

D.I. 83 at B98 (emphasis in original).

The Supreme Court of Delaware has not addressed whether the so-called "sophisticated purchaser" defense has a place in Delaware jurisprudence. While Delaware trial court decisions do not control where the Delaware Supreme Court has not spoken, a decision of the Delaware state trial court may be considered when a federal court engages in the hazardous chore of divining state law. [*33] *Cf. Robinson v. Jiffy Executive Limousine Co., 4 F.3d 237 (3d Cir. 1993).*

Several Delaware Superior Court decisions recognize the so-called "sophisticated purchaser" defense. This defense was first discussed in *In re Asbestos Litigation (Mergenthaler), 542 A.2d 1205 (Del. Super. Ct. 1986)* ("*Mergenthaler*"). There, plaintiffs had brought an action against several asbestos suppliers alleging, *inter alia*, failure to warn of the dangers associated with asbestos products. *Id. at 1207.* The defendants argued that plaintiffs' employers were sophisticated purchasers of the products and knew of the dangers of asbestos exposure. The court reviewed decisions of courts across the country and concluded that "some version of a 'sophisticated purchaser' defense is the norm in most jurisdictions." *Id. at 1211.* The standard which must be met to invoke the defense was set forth as follows:

When a supplier provides a product it knows to be dangerous to a purchaser/employer whom the supplier knows or reasonably believes is aware of that danger, there is no duty on the part of

the supplier to warn the employees of that purchaser unless the supplier knows or has reason to [*34] suspect that the requisite warning will fail to reach the employees, the users of the product.

*Id. at 1212.*

This standard has been analyzed as a two-part inquiry to determine whether the sophisticated purchaser defense is available to a defendant:

> First, did the supplier of the dangerous product know or reasonably believe that the purchaser was aware of the dangers of the product? If the answer is no, the supplier may not avail himself of this defense. If the answer is yes, the purchaser is considered "sophisticated," and the seller may rely on the purchaser to warn others of the danger of the product. The next inquiry is whether the supplier knew or had reason to suspect that the warning would fail to reach the purchaser's employees or the users of the product? If the answer is yes, the supplier is not relieved from his duty to warn.

*Sanderson v. Firestone Tire & Rubber Co.*, 1994 Del. Super. LEXIS 712, 1994 WL 807899 at *2 (Del. Super. Ct. July 28, 1994).

The *Mergenthaler* court, applying the standard above, ultimately concluded that summary judgment for defendants was improper. As to the first inquiry, the court found that the purchaser was sophisticated as a matter of law [*35] because it was involved with asbestos, had knowledge of the asbestos industry, and held itself out as following all OSHA regulations relating to asbestos. *Id. at 1213.* As to the second inquiry, however, the court held it was a jury question as to whether the supplier knew or had reason to suspect that the warnings were not being given to the purchaser's employees. *Id.* The court noted that while the supplier had never sent an agent to the purchaser's plant to observe its safety measures, in addition to the fact that the purchaser had represented that it was following OSHA regulations, the supplier was nonetheless aware of the purchaser's warnings because it had seen the purchaser's warning labels. The court stated that if a jury determined that the warning labels were inadequate, it may also find that the supplier was on notice that the purchaser's safety measures were inadequate. *Id.*

In *Steffen v. Colt Indus. Operating Corp.*, 1987 WL 8689 (Del. Super. Ct. Feb. 4, 1987), the court, in dicta, discussed this defense in connection with an industrial accident similar to the accident in the case *sub judice*. There, plaintiff was injured at work while attempting to lubricate [*36] a pump manufactured by defendant. Defendant had sent plaintiff's employer a safety manual containing the warning "Do not relubricate the pump while it is running." *Id. at *2.* Plaintiff, however, had not been instructed by his employer to first shut off the pump before attempting to relubricate it. *Id.* The court rejected plaintiff's failure to warn argument against the defendant, finding that defendant discharged its duty to warn by providing the safety manual to the employer, and reasonably believed that the employer was aware of the dangers associated with relubricating a moving pump. *Id. at *4.* Further, the court noted that defendant had no reason to suspect that the employer was not providing the warning to its employees, as it has an "economic incentive in not exposing its employees to unnecessary dangers." *Id.*

Umtech argues its duty to warn did not extend to Hansen because the warnings provided to K-F, a sophisticated purchaser, should have satisfied its duty. Applying the two-part test of *Mergenthaler* to these facts, the first inquiry is whether Umtech knew or reasonably believed that K-F was aware of the dangers of the product. Umtech argues that K-F provides [*37] sophisticated services at the Kent County site, including "dewatering of waste-activated sludge" and "[sludge] drying services." D.I. 73 at 32. Umtech notes that K-F employs roughly thirty-five employees. *Id.* Further, Umtech states that K-F operates waste treatment facilities for other government and private entities in the United States. *Id.* Because of these factors, Umtech believes that K-F is a sophisticated purchaser of Dryer 2 as a matter of law.

After reviewing the record, the Court concludes that the issue of K-F's sophistication should be determined by a jury. As noted above, "sophistication" for the purpose of this defense refers to the purchaser's awareness of the dangers of the product. This means K-F is sophisticated if Umtech reasonably believed K-F was aware of the dangers posed by Dryer 2. The record simply does not support that determination as a matter of law. Umtech provided a safety manual to K-F containing warnings about the dangers of exposed chain drives, and the necessity to replace guards if they are removed. However, one could argue that the absence of the guard over the chain drive which caused Hansen's injury suggests that Umtech did not believe [*38] this particular chain drive to pose a threat.

As an additional matter, the only evidence Umtech provided regarding K-F's sophistication is the number of persons K-F employs, its line of business, and its na-

1996 U.S. Dist. LEXIS 10949, *

tionwide operations in this line of business. These facts do not necessarily support a conclusion that K-F is knowledgeable about all the individual component machines and constituent parts which comprise a waste treatment plant such as the one at Kent County. Furthermore, K-F's *lack* of sophistication with respect to this dryer could be reasonably inferred from the fact that Umtech had to supply the personnel to install the machine in the first place. *See* D.I. 74 at A-220. Finally, K-F's president testified that K-F currently manages only two or three facilities in the country. *Id.* at A-7. Whether this fact warrants a conclusion that K-F is "sophisticated" should be determined by a jury. *See Sanderson*, 1994 WL 807899 at *2 (because the record was unclear as to whether the defendant knew or reasonably believed that the purchaser was aware of the dangers, i.e., whether the purchaser was sophisticated, summary judgment for defendant was improper).

Even assuming [*39] *arguendo* that K-F could be deemed "sophisticated," the next inquiry, whether Umtech knew or had reason to suspect that the warning would fail to reach K-F's employees, is also a jury question incapable of resolution at the summary judgment stage. First and foremost, Umtech had no on-site personnel overseeing operations at the Kent County plant after Dryer 2 was installed. Thus, it did not know if K-F was following its warnings in the safety manual regarding the importance of turning off the machine for cleaning. Further, after carefully reviewing the record, there is no evidence which supports an inference that Umtech knew or had any reason to suspect that warnings would reach K-F's employees. Therefore, the Court will not decide this issue as a matter of law at summary judgment. The "sophisticated purchaser" defense must be evaluated by a jury.

Umtech's final argument is that it had no duty to warn Hansen of defects, as it was merely the seller of a product which it did not manufacture. Umtech argues that a seller of goods has no duty to test or inspect a product for danger if the seller "neither knows nor has reason to know that [the product] is, or is likely to be, dangerous." [*40] D.I. 73 at 33 (quoting *Spaur v. Owens-Corning Fiberglas Corp., 510 N.W.2d 854, 864 (Iowa 1994)*).

Hansen argues that "Umtech had a duty to be aware of defects in Dryer No. 2 that reasonably should have been discovered in light of Umtech's peculiar opportunity and competence as a dealer in this particular type of chattel." D.I. 82 at 10-11. Hansen argues that Umtech held itself out as a sophisticated seller and installer of waste dryers, and that Umtech was aware of the danger of unguarded chain drives, as evidenced by its extensive warnings in the safety manual regarding the need to replace chain guards that are removed. *Id. at 11-14.* Han-

sen argues that because Umtech was more than a mere seller, its duty to warn exceeded that of a mere seller.

Both parties cite *In re Asbestos Litigation, 1993 Del. Super. LEXIS 476, C.A. No. 90C-10-72 (Del. Super. Ct. June 2, 1993)*, as authority for their arguments. Umtech urges that this case supports its position that a seller has only a limited duty to inspect for defects. Hansen argues that this case also held that where the seller of the product also engages in installation, it may be held to a higher standard of care. D.I. 82 at 11. Specifically, Hansen points [*41] to the following language from the *Asbestos* opinion:

> [Defendant] . . . was, however, more than just a supplier of products. It also conducted an insulation installation business according to evidence in the record. When, as here, a supplier exceeds its role as a mere supplier of goods, it may be held to a higher standard of care. In a case very similar to this case the Maryland Court of Appeal[s] rejected the standard sought by defendant. In particular, the Maryland Court held that a supplier of asbestos products who also installed those products had a duty to warn if it knew, or had reason to know, *or should have known* of these hazards.

*Asbestos, supra* at 3 (citations omitted) (emphasis in original).

Whether Umtech or Hansen correctly states the limit of the *Asbestos* court's rule, the Court concludes that even if Umtech is held to the lower duty standard applicable to mere sellers, there is sufficient evidence of record which could demonstrate to a jury that Umtech breached this duty. Umtech cites to the Supreme Court of Iowa for the proposition that a seller of goods has no duty to test or inspect a product for danger "who neither knows nor has [*42] reason to know that it is, or is likely to be, dangerous." D.I. 73 at 33 (quoting *Spaur, 510 N.W.2d at 864*). Umtech then cites an analogous rule from lower court decisions in Delaware. D.I. 73 at 33. Assuming *arguendo* that this standard would be applied by the Supreme Court of Delaware, by Umtech's own admission in its safety manual, it *had knowledge* that the chain drives should be protected by guards. Umtech provided ample warning in the safety manual that the guards of moving chain drives must be replaced before the machine may safely be turned on. *See* D.I. 83 at B88, B100. Thus, even if Umtech's duty as seller was merely to warn of defects it knew to be dangerous, a reasonable jury may

find that Umtech breached this duty. Umtech's motion for summary judgment on this ground will be denied.

## C. Umtech's Motion for Summary Judgment: Breach of Implied Warranty and Strict Liability

Umtech also moves for summary judgment on Counts III and IV of the Complaint, which respectively set forth claims for breach of implied warranties and strict liability.

### 1. Strict Liability

On May 2, 1996, Umtech moved for summary judgment on the issue of choice of law. D.I. 65. [*43] Umtech's position was that Delaware law governs the dispute. *Id.* On May 17, 1996, counsel for Hansen responded to the motion by letter, advising that he did not contest the application of Delaware law to the dispute. D.I. 79. On May 22, 1996, the Court denied Umtech's motion for summary judgment on choice of law, given the agreement between the parties that Delaware law applies. D.I. 84.

Delaware does not recognize a claim for strict liability in tort arising out of the sale of a product, due to the adoption of the Uniform Commercial Code. *Cline v. Prowler Indus., Inc., 418 A.2d 968 (Del. 1980)*. In light of Hansen's agreement that Delaware law applies, Hansen has elected not to pursue its claim for strict liability. *See* D.I. 82 at 1. Accordingly, Umtech's motion for summary judgment on the strict liability claim is unopposed and will be granted.

### 2. Breach of Implied Warranty of Merchantability

Count III of Hansen's complaint alleges a breach of implied warranty of merchantability under *6 Del. C. § 2-314*. A well-pleaded merchantability claim requires proof of the following elements:

(1) that a merchant sold goods;

(2) which were defective at the [*44] time of the sale;

(3) causing injury to the ultimate consumer;

(4) the proximate cause of which was the defective nature of the goods; and

(5) that the seller received notice of the injury.

*Neilson Business Equip. Ctr. Inc. v. Monteleone, 524 A.2d 1172, 1174 (Del. 1987); Dilenno v. Libbey Glass Div., Owens-Ill., Inc., 668 F. Supp. 373, 377 (D. Del. 1987)*.

Umtech argues that this claim should be dismissed because Hansen's own contributory negligence was the dominant, if not the sole, proximate cause of his injuries. D.I. 71 at 4. Hansen argues that Umtech's argument is legally flawed because Delaware recognizes that there can be more than one proximate cause of a plaintiff's injury. The Court agrees. *See Reese, 619 A.2d at 910; see also Culver, 588 A.2d at 1097*. Umtech's argument is without merit, and summary judgment on this claim will be denied.

## IV. Conclusion

Umtech's motion to disqualify Hansen's expert Castro will be denied. Umtech's motion for summary judgment on the negligence claim will be denied. Umtech's motion for summary judgment on the strict liability claim will be granted. Umtech's motion for summary judgment on the breach [*45] of implied warranty of merchantability claim will be denied. An appropriate order will be entered.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1313178 (D.Del.)
(Cite as: 2006 WL 1313178 (D.Del.))

Page 1

**H**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
B. Kurt PRICE, Wayne Warren, and Christopher D.
Foraker, Plaintiffs,
v.
L. Aaron CHAFFINCH, Thomas F. Macleish, David
B. Mitchell, and Division of
State Police, Defendants.
Christopher D. FORAKER, Plaintiff,
v.
L. Aaron CHAFFINCH, Thomas F. Macleish, David
B. Mitchell, and Division of
State Police, Defendants.
**No. 04-956 (GMS), 04-1207(GMS).**

May 12, 2006.

Martin D. Haverly, Esq., Thomas S. Neuberger,
Stephen J. Neuberger, The Neuberger Firm, P.A.,
Wilmington, DE, for Plaintiffs.

Richard Montgomery Donaldson, Noel C. Burnham,
Montgomery, McCracken, Walker & Rhoads,
Wilmington, DE, for Defendants.

*MEMORANDUM*

SLEET, J.

**I. INTRODUCTION**

**\*1** The above-captioned actions were consolidated
on April 18, 2006. In Civil Action No. 04-956 ("the
Price case"), three state troopers assigned to the
Delaware State Police's ("DSP") Firearms Training
Unit facility ("FTU") allege that their First
Amendment rights were violated by two superiors
who retaliated against them for speaking out against
hazardous health conditions at the FTU. Thus, the
Price complaint states one count of Free Speech
retaliation and one count of Petition Clause
retaliation, both pursuant to 42 U.S.C.A. § 1983
(2003). In Civil Action No. 04-1207 ("the Foraker
case"), Sergeant Christopher Foraker individually
alleges that his First Amendment rights were violated
by the same two superiors after they retaliated against
him for filing (and winning) a First Amendment
retaliation lawsuit in 2002. Thus, like the Price

complaint, the Foraker complaint also states one
count of Free Speech retaliation pursuant to § 1983,
and one count of Petition Clause retaliation pursuant
to § 1983. Additionally, the Foraker complaint states
two state law causes of action: defamation and false
light invasion of privacy. Presently before the court
are the defendants' motions for summary judgment on
all counts in both cases. For the following reasons,
the court concludes that summary judgment is
inappropriate for all counts except Foraker's false
light claim.

**II. STANDARD OF REVIEW**

Evaluating a motion for summary judgment requires
the court to "review the record as a whole, 'draw[ing]
all reasonable inferences in favor of the non-moving
party[,]' [while refraining from] weighing the
evidence or making credibility determinations.
*Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S.
133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)
(citation omitted). If [the court is able to] determine
that 'there is no genuine issue as to any material fact'
and that the movant is entitled to judgment as a
matter of law," summary judgment must be granted.
*Hill v. City of Scranton,* 411 F.3d 118, 124-25 (3d
Cir.2005) (quoting Fed.R.Civ.P. 56(c)).

**III. BACKGROUND**

The FTU, a multi-million dollar indoor firing range
for the DSP, became operational in September of
1998. A few months later, due to concerns about the
ventilation system, an environmental-assessment firm
hired to conduct a study of the air quality in the
facility concluded that the amount of lead in the air
significantly exceeded the maximum acceptable level
recommended by the Occupational Safety and Health
Administration. (D.I. 85 at A222.) [FN1] By at least
as early as June 14 of the following year, the FTU's
air-quality problems became the subject of public
scrutiny after *The News Journal*—a local Delaware
newspaper—publicized the results of the study in an
article entitled, "Shooting range under fire for lead:
State police are exposed to levels of metal in air
twice federal standard." (Id. at A2639-A2640, 189
A.2d 773.)

> FN1. "D.I. 85," which refers to Docket Item
> 85 in the Price case, was also filed as Docket
> Item 65 in the Foraker case.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1313178 (D.Del.)
(Cite as: 2006 WL 1313178 (D.Del.))

Foraker became the non-commissioned officer in charge ("NCOIC") of the FTU on August 1, 2001. At that time, he supervised several firearms instructors, including Corporal B. Kurt Price and Corporal Wayne Warren. Foraker also supervised Corporal Eddie Cathell, who was a personal friend Colonel L. Aaron Chaffinch. Foraker and Cathell had a rather rocky professional relationship, and on several occasions Foraker spoke out against Cathell. On February 22, 2002, Foraker was involuntarily transferred from the FTU to another position within the DSP. In response, Foraker filed a § 1983 action against Chaffinch for unlawful First Amendment retaliation. After a five-day trial, a jury found that Chaffinch had in fact retaliated against Foraker. The parties later agreed on settlement terms, pursuant to which Foraker was reinstated as the NCOIC of the FTU on December 1, 2003. After his reinstatement, Foraker learned that the FTU had the same air-quality issues that it had prior to his involuntary transfer in 2002. Not surprisingly, the air quality weighed on the minds of Foraker, Price, and Warren. Foraker soon began to voice their concerns to their commanding officers, including Lieutenant Colonel Thomas MacLeish. Eventually, the trio's concerns worked their way up the chain of command to Chaffinch.

*2 In March of 2004, the FTU's air quality remained poor and, as a result, the facility was formally closed. Due to the public attention the FTU's closing generated, Chaffinch gave two media tours of the facility in April 2004. Before the first tour, however, Chaffinch revealed his intent to blame Foraker for the FTU's closing to Captain Glenn Dixon:

[Chaffinch] talked about the meeting that he was going to at the range, and at that time he mentioned Sergeant Foraker and that he was going to put it on Foraker during the meeting. He had outlined that he had the newspaper people going [sic] to be present at the meeting and that he is going to put it on Foraker and lay a lot of the blame on Foraker for the range.

(Dixon Dep. at 8:7-13.) Consistent with this statement, Chaffinch was quoted during the tour as saying:

The previous sergeant in charge did a good job. Things changed in December [2003] when another sergeant came in. That's at least a portion of where the ball was dropped.

...

Because of the frangible ammunition we were using, the bullet trap required hands-on, daily cleaning. [The previous sergeant] was willing to do that.... I cannot say Sgt. Foraker was willing to do

that. He was interested in instruction and teaching people how to shoot. He did not feel that cleaning was part of his purview. He felt that was putting him in harm's way.

(D.I. 85 at A850.) Foraker was unable to respond to these allegations, which were printed in both the *Delaware State News* and *American Police Beat Magazine*, because Chaffinch placed a gag order on his troopers. Nevertheless, Foraker, Price, and Warren all gave statements in cooperation with an investigation by the State Auditor's Office. Shortly thereafter, Price and Warren were placed on light duty--ostensibly because they had disabilities rendering them unfit for regular duty--and Foraker was banned from attending Section Chief meetings he had attended in the past.

IV. DISCUSSION

A. First Amendment Retaliation (Counts I and II)

There is "a well-established three-step test to evaluate a public employee's claim of retaliation for engaging in activity protected under the First Amendment." *Hill*, 411 F.3d at 125. The employee must show at step one that the activity in question is protected by the First Amendment. *Hill*, 411 F.3d at 125. At step two, the employee must show "that the protected activity 'was a substantial factor in the alleged retaliatory action[s].' " *Hill*, 411 F.3d at 125 (citations omitted). Step two also requires the court to inquire whether the alleged retaliatory actions were serious enough to be actionable. *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir.2000) ("[N]ot every reaction made in response to an individual's exercise of his First Amendment right to free speech is actionable retaliation.") (cited by *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir.2006)). However, this is an extremely low hurdle to overcome:

*3 First Amendment retaliation claims are always individually actionable, even when relatively minor. Even "an act of retaliation as trivial as failing to hold a birthday party for a public employee," if "intended to punish her for exercising her free speech rights," may be actionable if under the circumstances it would be sufficient to "deter a person of ordinary firmness" from exercising his or her First Amendment rights. *Suppan v. Dadonna*, 203 F.3d 228, 234-35 (3d Cir.2000) (citing *Rutan v. Republican Party*, 497 U.S. 62, 76 n. 8, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990)). A First Amendment retaliation claim will lie for any individual act which meets this "deterrence threshold," and that threshold is very low: as we said in *Suppan*, a cause of action is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1313178 (D.Del.)
(Cite as: 2006 WL 1313178 (D.Del.))

Page 3

supplied by all but truly de minimis violations. *Id.*
*O'Connor v. City of Newark*, 440 F.3d 125, 127-28
(3d Cir.2006). Finally, at step three, "the employer
may defeat the employee's claim by demonstrating
that the same adverse action[s] would have taken
place in the absence of the protected conduct." [FN2]
*Id. See also Mount Healthy City Sch. Dist. Bd. of
Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50
L.Ed.2d 471 (1977).

> FN2. The plaintiffs contend that the
> defendants waived this affirmative defense--
> familiarly known as the *Mount Healthy*
> defense--by failing to raise it in their
> pleadings. The defendants point out that the
> plaintiffs raised it in the complaints by
> alleging that "[t]he defendants cannot prove
> by a preponderance of the evidence that
> absent a constitutional violation they would
> have had grounds to adversely treat
> plaintiffs" (D.I. 45 ¶ 94 (the Price case);
> D.I. 1 ¶ 84 (the Foraker case)), and the
> defendants denied the allegation in their
> answers. (D.I. 51 ¶ 94 (the Price case); D.I.
> 7 ¶ 84 (the Foraker case).) The court
> concludes that such denials were sufficient
> to put the plaintiffs on notice that the *Mount
> Healthy* defense would be at issue.

Here, all three plaintiffs clearly engaged in protected
First Amendment activity by speaking out about the
air-quality issues at the FTU, [FN3] and in Foraker's
case, by filing suit in 2002. Chaffinch had an obvious
motive to retaliate in response to the plaintiffs'
activities, and a jury could reasonably infer that
MacLeish (who was allegedly "joined at the hip" with
Chaffinch) would be similarly motivated to retaliate.
Furthermore, the allegedly retaliatory actions--
publicly blaming the plaintiffs for the FTU's poor air
quality, [FN4] placing Price and Warren on light
duty, banning Foraker from meetings, etc.--are more
than *de minimis*. And, with regard to the *Mount
Healthy* defense, the plaintiffs point to several
similarly-situated troopers who were not subject to
the same allegedly retaliatory actions. Thus, the
plaintiffs have demonstrated a genuine issue of
material fact at each step of the analysis, thereby
rendering summary judgment inappropriate as to
Counts I and II.

> FN3. The defendants argue that Price and
> Warren's Petition Clause claim (Count II)
> fails because their cooperation with the
> Auditor's investigation does not qualify, as a
> matter of law, as an attempt to petition the

government under the First Amendment.
Due to the number of disputed facts in this
case, including facts regarding the nature of
the plaintiffs' cooperation with the Auditor,
the court believes the most prudent course of
action at this stage is to deny summary
judgment as to Count II and revisit the issue
after trial.

> FN4. Although Chaffinch's comments to the
> media were explicitly directed at Foraker,
> there is evidence in the record suggesting
> that at least one trooper understood
> Chaffinch to be speaking about Price and
> Warren as well.

B. Qualified Immunity

The defendants argue that, even if summary
judgment in their favor is inappropriate, they are
nevertheless entitled to qualified immunity with
regard to Counts I and II. "Qualified immunity
insulates government officials performing
discretionary functions from suit insofar as their
actions could reasonably have been thought
consistent with the rights they are alleged to have
violated." *McKee*, 436 F.3d at 169 (internal
quotations omitted). "To determine whether an
official has lost his or her qualified immunity, [the
court] must first decide whether a constitutional right
would have been violated on the facts alleged." *Id.*
(internal quotations omitted). "If the answer to that
question is 'yes,' [the court] must then consider
whether the right was clearly established." *Id.*
(internal quotations omitted). "If [the court] also
answer[s] 'yes' to the second question, [the court]
must conclude that the official does not have
qualified immunity." *Id.*

*4 Because disputed issues of material fact exist
regarding the constitutional violations alleged in
Counts I and II, the answer to the first question
depends upon the resolution of those factual disputes.
Assuming *arguendo* that the answer to the first
question turns out to be "yes," the court must inquire
whether those rights, if violated, were clearly
established. In *McKee*, the Third Circuit succinctly
summarized the proper approach to such a query:
" 'Clearly established rights' are those with
contours sufficiently clear that a reasonable official
would understand that what he is doing violates
that right." *McLaughlin v. Watson*, 271 F.3d 566,
571 (3d Cir.2001). Put another way, "there must be
sufficient precedent at the time of the action,
factually similar to the plaintiff's allegations, to put

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 4
Not Reported in F.Supp.2d, 2006 WL 1313178 (D.Del.)
**(Cite as: 2006 WL 1313178 (D.Del.))**

[the] defendant on notice that his or her conduct is constitutionally prohibited." *Id.* at 572. The Supreme Court has recently reiterated this point, stating that "it is important to emphasize that this [clearly established] inquiry 'must be undertaken in light of the specific context of the case,' not as a broad general proposition." ' *Brosseau v. Haugen,* 543 U.S. 194, 125 S.Ct. 596, 599, 160 L.Ed.2d 583 (2004) (per curiam) (quoting *Saucier1 v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) ] ) (emphasis added).
436 F.3d at 171. Although this inquiry "must be undertaken in light of the specific context of the case," *Brosseau,* 543 U.S. at 198, "officials can still be on notice that their conduct violates established law even in novel factual circumstances," *Hope v. Pelzer,* 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). "Accordingly ... the salient question ... is whether the state of the law [at the time of the acts in question] gave [the defendants] fair warning that their alleged treatment of [the plaintiffs] was unconstitutional." *Id.*

In this case, the defendants admit that First Amendment retaliation is unlawful in general, but they argue that at the time of the alleged retaliation the state of the law did not give them fair warning that their treatment of Foraker was actionable. The court disagrees. In *Brennan v. Norton,* 350 F.3d 399 (3d Cir.2003)--a case decided before the retaliation in this case--the Third Circuit further defined the line between actionable and non-actionable retaliation. There, the court stated that, if there is a "nexus between [the] protected conduct and [the] alleged retaliation," an act as simple as affixing a sticker bearing the phrase "Department Asshole" on the plaintiff-firefighter's helmet "could rise to the level of a First Amendment violation." *Id.* at 419. The few retaliatory actions mentioned above are obviously more severe than the harassing sticker in *Brennan.* Therefore, the court holds that if the disputed issues of fact are resolved against the defendants, they will not be protected by qualified immunity.

**C. Defamation (Count III)**

"Under Delaware law, the tort of defamation has five elements: (1) the statement must be of a defamatory character; (2) publication to a third party; (3) the communication must refer to the plaintiff; (4) the third party's understanding of the communication's defamatory character; and (5) injury." *Gill v. Del. Park, LLC,* 294 F.Supp.2d 638, 646 (D.Del. Dec.2, 2003). Viewing the facts in the light most favorable to Foraker, Chaffinch's statements to the media easily

satisfy the five elements of defamation: (1) assigning (allegedly) unwarranted blame to Foraker for the FTU's air quality is defamatory; (2) making a statement to a newspaper is publication to a third party; (3) mentioning Foraker by name obviously refers to him; (4) any person reading Chaffinch's statement would understand it to be defamatory; and (5) maligning a person in his profession is injurious *per se, Johnson v. Campbell,* No. 00-510- JJF, 2001 U.S. Dist. LEXIS 25596, at *14-*15 (D.Del. Mar. 30, 2001). Likewise, MacLeish's statements--the air-quality problems had began only recently, and procedure had not been followed at the FTU--also satisfy all five elements. To be sure, MacLeish's statements present a closer case because he neither referred to Foraker by name, nor explicitly blamed the FTU's problems on him. Nevertheless, a reasonable jury could infer from the context of the controversy that MacLeish's statements were in fact defamatory of Foraker.

**\*5** The defendants argue that they cannot be held liable for defamation because they were merely stating their opinions. In *Milkovich v. Lorain Journal Co.,* the Supreme Court explained:

If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar."

497 U.S. 1, 18-19, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). Here, the defendants' opinions "imply a knowledge of facts" leading to the conclusion that Foraker's performance as the NCOIC was inadequate. Accordingly, the defendants may not escape liability by hiding behind the "opinion" shield. The defendants also contend that they cannot be held liable for defamation because their statements were substantially true. However, as the defendants must understand, the question of who was at fault for the FTU's poor air quality is fraught with so many disputed facts that the court cannot determine the truth or falsity of the defendants' statements at this stage.

The only remaining issue is whether Foraker is a public figure. "Where the plaintiff is a public figure, there is an additional constitutional requirement that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1313178 (D.Del.)
(Cite as: 2006 WL 1313178 (D.Del.))

the defendant have acted with actual malice. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Actual malice exists where the declarant acts with 'knowledge that it was false or with reckless disregard of whether it was false or not.' " *Id. Gill,* 294 F.Supp.2d at 646. The determination of whether a plaintiff is a public figure is a legal issue for the court to resolve. *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.,* 898 F.2d 914, 938 (3d Cir.1990). *"Gertz [v. Robert Welch, Inc.,* 418 U.S. 323, 345, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) ] identified three classes of public figures: those who achieve such stature or notoriety that they are considered public figures in all contexts; those who become public figures involuntarily, but these are 'exceedingly rare'; and those who are deemed public figures only within the context of a particular public dispute." *U.S. Healthcare,* 898 F.2d at 938. The latter class--limited purpose public figures--comprise "individuals who voluntarily 'thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." ' *Id.* (quoting *Gertz,* 418 U.S. at 345). "Generally, two factors inform this determination. The first factor indicative of a [plaintiff's] status is his relative access to the media." *U.S. Healthcare,* 898 F.2d at 938. "The second factor is the manner in which the risk of defamation came upon [the plaintiff]." *Id.*

*6 Here, Foraker's access to the media was limited to the point of being non-existent by Chaffinch's imposition of a gag order. Certainly, that cuts against Foraker's public-figure status. On the other hand, the air quality at the FTU was a public controversy as early as 1999. And yet, Foraker, who was aware of the ongoing controversy, actively sought to be reinstated as the NCOIC of the FTU. Thus, Foraker knew or should have known that he was injecting himself into a situation in which, as the head of a controversial facility, there was a substantial risk of public scrutiny and defamation. The question the court must answer, then, is whether Chaffinch's gag order outweighs Foraker's voluntary assumption of risk. In *Sculimbrene v. Reno,* 158 F.Supp.2d 8 (D.D.C. Feb.16, 2001), the D.C. district court was confronted with a similar situation. In that case, the plaintiff was a former FBI Special Agent who became involved in the "Filegate" scandal as a result of his employment at the White House Liaison Office. After media commentator Lanny Davis made disparaging comments about the plaintiff on CNN and CNBC, the plaintiff sought permission to respond publicly. However, that request was denied by his superiors. *Id.* at 11-14; *id.* at 23. The plaintiff

then sued Davis under a defamation-like federal statute. In spite of the FBI's refusal to allow the plaintiff to respond publicly, the court concluded that the plaintiff was a limited purpose public figure both because of the high public interest in "Filegate," and because of the plaintiff's significant role in determining the outcome of the controversy. *Id.* at 23-24. Likewise here, although Foraker was subject to a gag order, as the NCOIC of the FTU he was a significant player in a controversy with high (local) public interest. Moreover, unlike the plaintiff in *Sculimbrene,* Foraker sought the NCOIC position with advance knowledge of the attendant controversy. Therefore, as with the FBI agent in *Sculimbrene,* Foraker is a limited purpose public figure in this context, and therefore, he must prove his defamation case using the heightened "actual malice" standard. The court further holds that the record contains sufficient evidence for a reasonable jury to conclude that the defendants' statements were made with actual malice. Thus, summary judgment will be denied as to Count III.

D. False Light Invasion of Privacy (Count IV)

The common law right of privacy was first recognized by the Delaware Supreme Court in *Barbieri v. News-Journal Co.,* 56 Del. 67, 189 A.2d 773 (1963). "The general purpose of protecting the right of privacy relates to one's private life, not when that life has become a matter of legitimate public interest." *Martin v. Widener Univ. Sch. of Law,* No. 91C-03-255, 1992 Del.Super. LEXIS 267, at *54 (Del.Super. Ct. June 4, 1992). Thus, "[o]ne who seeks the public eye cannot complain of publicity if the publication does not violate ordinary notions of decency." *Barbieri,* 56 Del. at 70, 189 A.2d 773.

*7 With those principles in mind, the defendants argue that "a public figure cannot sustain an action for false light invasion of privacy because someone has publicized his public activities." (D.I. 62 at 32.) The court agrees. Although the act of publicly shedding false light on a person's job performance can be deeply offensive and hurtful, there is simply no invasion of *privacy* when the person being criticized is a public figure and the performance being criticized is the very activity that gave rise to the person's public-figure status in the first place. *See Godbehere v. Phoenix Newspapers,* 162 Ariz. 335, 783 P.2d 781, 789 (Ariz.1989) (holding that "a plaintiff cannot sue for false light invasion of privacy if he or she is a public official and the publication relates to performance of his or her public life or duties"). Therefore, the court concludes that allegedly

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1313178 (D.Del.)
**(Cite as: 2006 WL 1313178 (D.Del.))**

unwarranted criticism of Foraker's performance as the NCOIC at the controversial FTU does not give rise to a cause of action for false light invasion of privacy.

## V. CONCLUSION

For the reasons stated, the court will deny summary judgment as to Counts I, II, and III. The court will grant summary judgment as to Count IV.

### ORDER

IT IS HEREBY ORDERED THAT:

1. The defendants' motion for summary judgment in the Price case (D.I.80) be DENIED; and

2. The defendants' motion for summary judgment in the Foraker case (D.I.60) be DENIED as to Counts I, II, and III, and GRANTED as to Count IV.

Not Reported in F.Supp.2d, 2006 WL 1313178 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE 2005 U.S. DIST. LEXIS 786

**DAVID M. TAWES, Plaintiff, v. FRANKFORD VOLUNTEER FIRE COMPANY, Defendant.**

**Civil Action No. 03-842-KAJ**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2005 U.S. Dist. LEXIS 786; 16 Am. Disabilities Cas. (BNA) 660*

**January 13, 2005, Decided**

**DISPOSITION:** Defendant's motion for summary judgment was granted. Count was dismissed.

**COUNSEL:** [*1] Alan G. Davis, Esquire; Henry Clay Davis III, P.A., Georgetown, Delaware, for Plaintiff.

David R. Hackett, Esquire, Griffin & Hackett, P.A., Georgetown, Delaware, for Defendant.

**JUDGES:** JORDAN, District Judge.

**OPINION BY:** Kent A. Jordan

**OPINION**

**MEMORANDUM OPINION**

**JORDAN, District Judge**

**I. Introduction**

David M. Tawes ("Plaintiff"), a former member of the Frankford Volunteer Fire Company ("Defendant" or the "Fire Company"), alleges that Defendant violated his rights under the Americans with Disabilities Act of 1990, *42 U.S.C. §§ 12101 et seq.* ("ADA"). Before me is Defendant's Motion to Dismiss. (Docket Item ["D.I."] 3; the "Motion".) Jurisdiction over this case is proper pursuant to *28 U.S.C. § 1331*. For the reasons that follow, Defendant's Motion will be treated as a motion for summary judgment and will be granted.

**II. Background** [1]

1  The following rendition of the background information does not constitute findings of fact and is cast in the light most favorable to the nonmoving party, the Plaintiff.

[*2] On June 7, 1997, Defendant applied for and, shortly thereafter, was granted membership in the Fire Company as a volunteer firefighter. As part of Plaintiff's application, he agreed to complete certain training, including Hazardous Materials Response Skills Training ("Haz-Mat Training"), within two years of acceptance. (D.I. 1 P 9; D.I. 5 at A-54.) Plaintiff notes, however, that the by-laws that were in force at the time of his application, contained no such requirement. (D.I. 8 at P 3.) In December of 2000, approximately three and one half years after being accepted as a member of the Fire Company, Plaintiff was reminded by the Fire Company that he had not completed the required Haz-Mat Training. (*Id.* at P 4.) The next month, the Fire Company gave Plaintiff a one year extension to complete that training. (*Id.* at P 5.)

In February of 2001, Plaintiff was injured during his full-time employment as a truck driver. (*Id.* at P 7.) As a result of his injury, Plaintiff could not work as a truck driver and was removed from active duty at the Fire Company. (*Id.* at P 8-9.) Plaintiff did, however, act as a fire reporter for the Fire Company during this time and responded [*3] to enough calls that year to qualify to have the Fire Company contribute $ 60 to a pension fund in his name. [2] (*Id.* at P 9-10.) At the end of the one year extension, in January of 2002, four and one half years after Plaintiff joined the Fire Company, the Fire Company revoked Plaintiff's membership for failure to complete the Haz-Mat Training. (*Id.* at P 13.)

2  Each member of the Fire Company has the opportunity to contribute $ 60 a year to a state pension fund or, if the member responds to a certain number of calls in a given year, the Fire Company will make the contribution in the member's name. A contributing member is eligible to receive certain pension benefits after 10 years of service. *16 Del. C. § 6655.*

Before the revocation of his membership, Plaintiff was also eligible for other benefits, namely, discounts on wireless phones and service from Verizon, personal use of the Fire Company's premises, and line-of-duty benefits. (*Id.* at P18.) Such benefits do not appear to have economic value [*4] to Plaintiff outside his fire fighting role. The line-of-duty benefits included secondary automobile insurance coverage to protect against damage incurred while responding to a call, *19 Del. C. Ch. 23*; line-of-duty death benefits, *18 Del. C. Ch. 66*; line-of-duty disability benefits, *18 Del. C. Ch. 67*; funeral expenses for line-of-duty death, *18 Del. C. Ch. 67*; compensation under the State Workers Compensation Program for injuries sustained in the line duty, *19 Del. C. §2101, et seq.*; a $ 300 tax credit for the purchase of "essential items necessary to perform duties as an active volunteer firefighter," *30 Del. C. § 1113*; firefighter skills training (D.I. 8 at P 18); and uniforms and equipment necessary to perform fire fighting duties (*id.* at P 20).

**III. Standard of Review**

If, on a motion to dismiss for failure to state a claim, "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56 ... ." *Fed. R. Civ. P. 12(b)*. "The element that triggers the conversion [of a 12(b)(6) motion into a motion for summary judgment] is a challenge to the [*5] sufficiency of the pleader's claim supported by extra-pleading material." 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1366 at 485 (2d ed. 1990 and 2003 Supplement). *See also In re Rockefeller Ctr. Props. Sec. Litig., 184 F.3d 280, 287 (3d Cir. 1999)* (quoting Wright & Miller).

In the present case, Plaintiff and Defendant have offered numerous matters outside the pleadings in support of their Motions, including information on the type and scope of the benefits received by Plaintiff and other volunteer firefighters. (*See* D.I. 4 at 10-11; D.I. 7 at 7-8; D.I. 9 at 8-9.) The Defendant, in its Motion, has cited these matters as a challenge to the sufficiency of Plaintiff's claims. Furthermore, Plaintiff has agreed that "this motion is one more properly considered under a Summary Judgment standard since the parties are presenting materials in addition to the pleadings in support and opposition to the Motion to Dismiss." (D.I. 7 at 6.) Accordingly, Defendant's Motion will be treated as a motion for summary judgment under *Rule 56*.

After a motion to dismiss is converted into a motion for summary judgment, "all parties [*6] shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." *Fed. R. Civ. P. 12(b)*. The Third Circuit has stated that "the parties can take advantage of this [reasonable] opportunity only if they have 'notice of the conversion.'" *In re Rockefeller, 184 F.3d at 287-288* (quoting *Rose v. Bartle, 871 F.2d 331, 349 (3d Cir. 1989)*). Although Defendant's Motion was labeled as a Motion to Dismiss, the substance of the Motion makes it clear that Defendant was, in the alternative, moving under a summary judgment standard. (*See* D.I. 4 at 7 (stating that "the Court may elect to treat and review the Fire Company's Motion to Dismiss as a Motion for Summary Judgment).) This fact, coupled with Plaintiff's acknowledgment that this Motion "is one more properly considered under a Summary Judgment standard" (D.I. 7 at 6), demonstrates that Plaintiff has had adequate notice that Defendant's Motion could be treated as a motion for summary judgment.

*Rule 56* of the Federal Rules of Civil Procedure provides that summary judgment shall be entered if "there is no genuine issue as to any material fact and ... the moving party [*7] is entitled to judgment as a matter of law." "The availability of summary judgment turn[s] on whether a proper jury question ... [has been] presented." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. "The judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* In making that determination, the court is required to accept the non-moving parties' evidence and draw all inferences from the evidence in the non-moving parties' favor. *Id. at 255; Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456, 119 L. Ed. 2d 265, 112 S. Ct. 2072 (1992)*. Nevertheless, the party bearing the burden of persuasion in the litigation, must, in opposing a summary judgment motion, "identify those facts of record which would contradict the facts identified by the movant." *Port Authority of New York and New Jersey v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2002)* (internal quotes omitted).

**IV. Discussion**

Plaintiff's Complaint contains three claims: Count 1 is a claim for Employment Discrimination under *Title I of the ADA*; Claim [*8] II is a claim for Public Entity Discrimination under *Title II of the ADA*, and; Count III is a claim for Public Accommodation Discrimination under *Title III of the ADA*. (D.I. 1 at PP 20-31.) Plaintiff has voluntarily consented to the dismissal of Count III. (D.I. 7 at 4.)

**A. ADA Title I - Employment Discrimination**

*Title I of the ADA* states that

no covered entity shall discriminate against a qualified individual with a dis-

2005 U.S. Dist. LEXIS 786, *; 16 Am. Disabilities Cas. (BNA) 660

ability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

*42 U.S.C. § 12112.* A covered entity includes an employer, which is defined as "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person... ." *42 U.S.C. § 12111.*

Both sides agree that, not including volunteers, Defendant never had more than three employees. (D.I. 4 at 10; D.I. 7 at 7.) Therefore, for Defendant [*9] to be subject to the requirements of the ADA, Plaintiff and the other volunteer firefighters must be considered to be "employees" of Defendant. The ADA defines an "employee" as "an individual employed by an employer." *42 U.S.C. § 12111.* Although this circular definition is of limited utility, the statute adds that the term "person," which is used to define the term "employer," "shall have the same meaning given such terms in section 701 of the Civil Rights Act of 1964 (*42 U.S.C. 2000e*). *42 U.S.C § 12111(7)*; *see* 9 LEX K. LARSON, *EMPLOYMENT DISCRIMINATION § 152.01* (2d ed. 2004) (stating that "the ADA specifically provides that these terms [*e.g.*, 'employer'] be interpreted with reference to *Title VII*"). Therefore, the more well-developed *Title VII* precedent can act as a guide to the interpretation of the terms "employee" and "employer".[3]

> 3  All references to "employee" are in connection with determining if Defendant is a covered entity under the ADA. The definition of "employee" outside of this context may be different. 4 Lex K. Larson, *Employment Discrimination § 4.01[1].*

[*10] Whether someone is an "employee" is "a question of federal, rather than of state, law; it is to be ascertained through consideration of the statutory language of the Act, its legislative history, existing federal case law, and the particular circumstances of the case at hand." *Calderon v. Martin County, 639 F.2d 271, 272-273 (5th Cir. 1981).* The Supreme Court has stated that the purpose of *Title VII* "is plain from the language of the statute. It was to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group." *Griggs v. Duke Power Co., 401 U.S. 424, 430, 28 L. Ed. 2d 158, 91 S. Ct. 849 (1971).* "In enacting *Title VII*, Congress sought to eliminate a pervasive, objectionable history of denying or limiting one's livelihood simply because of one's race,

color, sex, religion or national origin." *Smith v. Berks Community Television, 657 F. Supp. 794, 795 (D. Pa. 1987)* (internal citation omitted). The same motivation can be seen in the text of the ADA, which states that the statute is applicable in "regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, [*11] job training, and other terms, conditions, and privileges of employment." *42 U.S.C. § 12112.*

The Supreme Court has held that, in "the application of social legislation[,] employees are those who as a matter of economic reality are dependent upon the business to which they render service." *United States v. W. M. Webb, Inc., 397 U.S. 179, 185, 25 L. Ed. 2d 207, 90 S. Ct. 850 (1970)* (internal citation omitted). As such, when determining if an individual's livelihood is denied or limited in an employment discrimination case, "one must examine the economic realities underlying the relationship between the individual and the so-called principal." *Armbruster v. Quinn, 711 F.2d 1332, 1340 (6th Cir. 1983).* Compensation is of course of paramount importance to such an inquiry. *O'Connor v. Davis, 126 F.3d 112, 116 (2d Cir. 1997)* (holding that remuneration is an "essential condition" of employment, and a volunteer, who did not receive compensation, was not an "employee" under *Title VII*). In addition, the "manner in which the parties view the relationship is some evidence as to whether the [individual] in any particular case will be deemed an employee. [*12] ' " *Id.*

Numerous courts have held that volunteers are not employees for purposes of employment discrimination. *See, e.g., Graves v. Women's Professional Rodeo Ass'n, 907 F.2d 71 (8th Cir. 1990)* (holding that benefits accrued as a member in a rodeo association does not raise the members to the status of employees); *Hall v. Delaware Council on Crime & Justice, 780 F. Supp. 241, 244 (D. Del. 1992)* (holding that "reimbursement for some work-related expenses and free admittance to an annual luncheon [does not] constitute compensation significant enough to raise a volunteer to the status of an employee"); *Berks Community Television, 657 F. Supp. at 795-96* (holding that an individual that volunteered at a television studio, and received no compensation or fringe benefits, was not an employee under *Title VII*). Reimbursement for a volunteer's expenses is, standing alone, not sufficient to make the volunteer an "employee." *Hall, 780 F. Supp. at 244.*

Plaintiff cites *Haavistola v. Community Fire Co., 6 F.3d 211 (4th Cir. 1993),* for the proposition that volunteer firefighters are employees under the ADA. [*13] (D.I. 7 at 8-9.) In *Haavistola,* membership in the fire company offered the plaintiff one of the few practical ways to qualify as an Emergency Medical Technician - Paramedic ("EMT-P"). *6 F.3d at 221.* In addition to po-

2005 U.S. Dist. LEXIS 786, *; 16 Am. Disabilities Cas. (BNA) 660

tentially qualifying as an EMT-P through membership in the fire company, the plaintiff received other benefits, including reimbursement for medical training and group health insurance. *Id.* The court held that these benefits were sufficient to raise a triable issue of fact as to whether the plaintiff was an employee under *Title VII. Id.* To the extent that this case can be read as holding that an individual who works in exchange for training and employment certification, particularly when alternate means of certification are not available, the decision is distinguishable from the case at bar. To the extent that it can be read to say that a volunteer who receives incidental benefits as a result of volunteering is a covered employee under *Title VII,* it is unpersuasive. *See Hall, 780 F. Supp. at 244* (holding that "reimbursement for some work-related expenses" and other minor benefits received by volunteers "is insufficient to consider [*14] these volunteers employees").

It is true that Plaintiff received certain benefits as a result of volunteering at the Fire Company. The question is whether those benefits transform Plaintiff's volunteer relationship with the Fire Company into an employee/employer relationship. To make that determination, I must look at the "economic reality" of the situation. *See W. M. Webb, 397 U.S. at 185.* As discussed above, the benefits that the Fire Company provides to its volunteers consist of line-of-duty benefits, discounts with Verizon, and a pension system. *See supra* at 2-3.

The line-of-duty benefits are not sufficient to make Plaintiff an employee of the Fire Company. Secondary automobile insurance to protect against damage to one's automobile while responding to a call, and insurance to protect against death or injury while acting in one's duty as a volunteer firefighter, have no benefit outside of one's role as a firefighter. Consequently, losing such benefits does not affect one's livelihood. The Verizon discount too appears to be inconsequential, and plaintiff does not allege that the Fire Company or the State of Delaware underwrote those discounts or that they [*15] cannot be substantially replicated through other discount offerings from Verizon or its competitors.

The benefit that raises the most significant question is the pension benefit. As a member of the Fire Company, Plaintiff was permitted to contribute $ 60 per year to the fund and, after age 60 and ten years of service, would have been entitled to receive a pension. *16 Del. C. § 6655.* (D.I. 5, Ex. C at 24-25.) If, however, a member works a minimum of 40 hours in some capacity for the Fire Company, then the Fire Company contributes the $ 60. (D.I. 5, Ex. C at 24-25.) Examining the two parts of the program separately, namely the potential $ 60 annual contribution by the Fire Company and the attendant right to receive a pension, I conclude that the pension benefit does not create an employment relationship. With respect

to the yearly contribution of $ 60, such a sum does not rise to the level of employment compensation. Assuming that Plaintiff participates in the minimum required hours to receive the contribution, then it amounts to $ 1.50 per hour. As this is a minimum, however, firefighters may spend more time participating in Fire Company related activities, thus driving the per [*16] hour rate even lower. As to the receipt of the pension itself, Plaintiff has done nothing to rebut the inference that this benefit too is minor, when viewed in the context of remuneration ordinarily associated with employment. Plaintiff has not alleged any benefits associated with the pension fund, beyond the potential return on the $ 60 annual contribution. (*Id.*) Therefore, he has failed to cite any facts showing that the pension benefit is the type of benefit that supports a finding of "employment." *See Port Auth. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2002)* (holding that "when opposing a motion for summary judgment, the party bearing the burden of persuasion in the litigation is obligated to identify those facts of record which would contradict the facts identified by the movant" (internal citation omitted)).

Finally, and not of least importance, the evidence indicates that the parties themselves viewed their relationship as resting strictly on a volunteer basis. Volunteers are not motivated to join the Fire Company for economic reasons. The financial benefits are much lower than can be expected at even minimum wage employment and can fairly [*17] be described as *de minimis.* In addition, Plaintiff does not argue that membership in the Fire Company allows him or other members to qualify to work in new and desirable fields. Instead, as Plaintiff himself admits, volunteering one's time as a firefighter brings "pride and intangible benefits" associated with membership. (D.I. 7 at 8.) Firefighters volunteering to serve through the Defendant make tremendous contributions to their communities, often at significant personal sacrifice. That they do so as volunteers makes their sacrifice all the more admirable, and the economic reality remains that they are not employees.

Consequently, I find that Plaintiff and his fellow volunteers are not employees with respect to the determination of whether the Fire Company had 15 employees during the relevant time frame. Therefore, the Fire Company is not a covered entity under *Title I of the ADA,* and Plaintiff is not entitled to relief under that statute.

## B. ADA Title II - Public Entity Discrimination

*Title II of the ADA* provides:

> Subject to the provisions of this title, no qualified individual with a disability shall, by reason of such disability, be excluded

Page 5

2005 U.S. Dist. LEXIS 786, *; 16 Am. Disabilities Cas. (BNA) 660

from participation [*18] in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. Here, the dispute centers on whether Plaintiff was denied "participation in ... the services" of the Fire Company. [4] *Id.* Defendant argues that "participation" here cannot mean participation as a volunteer because the services at issue, *i.e.*, the "output" of the Fire Company, is fire protection, not volunteer satisfaction. (D.I. 4 at 31-33.) In short, the Defendant says, volunteering is not an "output" of the Fire Company and therefore is not protected under *Title II*. (D.I. 4 at 31-33.) Plaintiff admits that the Third Circuit has not ruled on the validity of the output theory of analyzing ADA claims under *Title II* but argues that, even if adopted by this court, the theory does not apply in the present case. (D.I. 7 at 29-32.)

> [4] The parties also disagree over whether the Fire Company is a "public entity," within the meaning of the ADA. I make no ruling as to that issue. For the purpose of this Opinion, however, I have assumed that the Fire Company is such an entity.

[*19] The output theory is sound and has been adopted by courts in other jurisdictions. In *Zimmerman v. Oregon DOJ*, the Ninth Circuit noted that "Congress unambiguously expressed its intent for *Title II* not to apply to employment." *170 F.3d 1169, 1173 (9th Cir. 1999)* (citing *National Credit Union Admin. v. First Nat'l Bank & Trust Co., 522 U.S. 479, 140 L. Ed. 2d 1, 118 S. Ct. 927 (1998))*. Defining employment as an input, the court went on to state that *Title II* applies when a "public entity provides an output that is generally available, and that an individual seeks to participate in or receive the benefit of such an output." *Id. at 1174. See also Currie v. Group Ins. Comm'n, 147 F. Supp. 2d 30, 35 (D. Mass. 2001)* (stating that "when one thinks of a public entity's services, programs, and activities, one imagines some operation of the agency that is offered for the benefit of the general public").

Plaintiff argues that because "there is no way that a user of the services of the fire company can 'participate in' those activities" other then by being a member, *Title II* must apply. (D.I. 7 at 30.) Plaintiff, however, misinterprets the statute. The statute states that [*20] no individual shall be denied "participation in or be denied the benefits of the services, programs, or activities of a public entity ... ." *42 U.S.C. § 12132.* The Defendant is correct in arguing that the public entity output here is the service of protecting the community against fires. *Title II* must be read to guard against discrimination in providing that service. But that is the logical limit. As Plaintiff has not demonstrated a denial of the benefit of fire protection, *Title II* is not a valid basis for Plaintiff's claim against the Defendant.

## V. Conclusion

For the reasons set forth herein, Count III of the Complaint will be dismissed with prejudice, and Defendant's Motion to Dismiss (D.I. 3), which has been converted to a Motion for Summary Judgment, will be GRANTED as to the remaining counts in the Complaint. An appropriate order will follow.

## ORDER

For the reasons set forth in the Memorandum Opinion issued in this matter today,

IT IS HEREBY ORDERED that Count III of the Complaint (D.I. 1 at PP 28-32) is dismissed with prejudice, and Defendant's Motion to Dismiss (D.I. 3), which has been converted to a Motion for Summary Judgment, [*21] is GRANTED as to the remaining counts in the Complaint.

Kent A. Jordan

UNITED STATES DISTRICT JUDGE

Wilmington, Delaware

January 13, 2005